[Sac. No. 8000. In Bank. Oct. 28, 1974.]

ROSA LEE HENDERSON et al., Plaintiffs and Appellants, v. HARNISCHFEGER CORPORATION, Defendant and Respondent.

## Counsel

Andrew J. Smolich, Bertolani & Smolich, P. M. Barceloux, Burton J. Goldstein, Albert E. Levy, Ralph Golub, Goldstein, Barceloux & Goldstein and M. Reed Hunter for Plaintiffs and Appellants.

P. Beach Kuhl, Sedgwick, Detert, Moran & Arnold and David B. Paynter for Defendant and Respondent.

## Opinion

**SULLIVAN, J.**—In this action for damages for wrongful death, plaintiffs, who are the surviving wife and children of Thomas Jackson Henderson, appeal from a judgment entered on a verdict in favor of defendant

Decedent was employed as an oiler by Continental-Heller Corporation on a construction project at the University of California at Davis. He was assigned to a large earthmoving crane manufactured by defendant Harnischfeger Corporation, which was operated by Maynard, a Continental employee. Decedent's duties were to keep the crane properly oiled and greased, to move it from one job to another and to assist the operator in its safe and efficient use. The equipment consisted of a cab containing the operator's controls, a boom mounted on the body in front of the cab and a counterweight to the rear of the cab designed to give the crane stability when the boom was extended. There was evidence that the boom and its counterweight normally rotated without making any noise.

Decedent was killed by the crane shortly after he had signaled the operator that the boom could be swung into a new position. As the boom was rotating, the operator felt a "thump" and immediately stopped the crane. No one observed the accident but the record establishes that de-

cedent was struck by the counterweight and crushed against the base of the crane.[1]

Plaintiffs brought the present action against Harnischfeger Corporation as the manufacturer of the equipment on theories of negligence and strict liability in tort. They premised the latter theory on the charge that the crane was defective in design in that it was impossible for the operator to have a full view to the rear while operating the equipment. The case was tried to a jury only on the theory of strict liability.

Plaintiffs produced expert testimony at trial in order to prove that the crane was defective. Joseph Williams, a mechanical engineer who had inspected the crane, testified that the cab of the crane was designed in such a manner as to completely obstruct the view of the operator to the rear in the area where the counterweight swung. He expressed the opinion that this blind spot could be almost entirely eliminated by installing a mirror on the side of the cab; that, depending on the size and shape of the mirror, it would give the operator a clear field of vision to the counterweight during its movement; that a mirror could be effectively used by the operator without interfering with his control of the crane; and that its cost would not exceed $125. In addition, he stated the crane could be equipped with a sounding device which would warn others not to enter the zone of danger during the operation of the crane.[2] Such a device could be installed at a cost of $100 to $200. John New, an experienced crane operator, who had handled an identical crane, testified that after nearly hitting a person with the counterweight, he installed a mirror to eliminate the blind spot in the rear. However, the mirror was required to be dismantled each time the crane was moved to a new site and, on one occasion when he failed to replace the mirror, an accident remarkably similar to the present one occurred. New expressed the opinion that the accident would not have occurred had his crane been equipped with the mirror. Further, he believed that a crane operator would be able to use a mirror for rear vision and still devote sufficient attention to the movement of the crane in front.

---

[1] The reason for decedent's presence in the danger zone is not entirely clear. The evidence suggests that he might have been urinating; the fly of his trousers was open and a tire on the rig was observed to be wet. On the other hand, the record supports the inference that the decedent might have been using a cabinet—situated on the side of the crane where the accident occurred—in which he kept his tools and equipment. After the accident, the cabinet door was found open and a coffee cup, apparently taken from the cabinet, was found nearby.

[2] Because of limited visibility to the rear, the crane came equipped with a similar device which sounded a warning when the carriage of the crane was moved in reverse.

Defendant introduced expert testimony to the contrary. James Collins, a mechanical engineer, while conceding that the installation of a mirror would enable the operator to see to the rear, recommended against such a measure. In his opinion it would divert the attention of the operator from the movement of the boom, which he thought was the major hazard to the operator and to others. He concluded that a sounding device would be ineffective since the danger of entering the area of the arc of the counterweight would be obvious to anyone.

Defendant also presented evidence on its defense of assumption of risk. Churchill Brunley, who was supervising the operation of the crane on the day of the accident, described decedent as "alert" and "intelligent." He testified that upon leaving the area about 10 or 15 minutes before the accident occurred, he warned decedent about the danger of being struck by the counterweight and instructed the latter to keep other persons out of the danger zone. Additionally, the record reveals that the decedent had been employed as an oiler for four years and was familiar with the operation of the crane.

In instructing the jury on the theory of strict liability in tort, the trial court gave a modified version of former BAJI No. 9.01 (Cal. Jury Instrs. Civ. (5th rev. ed. 1969)).[3] Under this instruction, the court informed the

---

[3]The instruction stated as follows: *"The defendant manufacturer of a product is not required under the law so to create and deliver its product as to make it accident proof;* however, it is subject to liability to the plaintiffs for any injury suffered· by them *if the plaintiffs establish by a preponderance of the evidence* all of the facts necessary to prove each of the following conditions:

"First: That the defendant placed the product in question on the market, and the defendant knew, or in the exercise of reasonable care should have known, that the particular product, without substantial change, would be used in the way and for the general purpose for which it was designed and intended;

"Second: That the product was defective in design or manufacture at the time it was placed on the market and delivered;

"Third: *That the deceased was unaware of the claimed defect;*

"Fourth: That the claimed defect was a proximate cause of any such injury or death occurring while the product was being used in the way and for the general purpose for which it was designed and intended, and in a manner which was reasonably foreseeable by the manufacturer at the time the product was placed on the market;

"and Fifth: *That the defect, if it existed, made the product unreasonably dangerous and unsafe for its intended use."* (Italics added.)

The instruction is no longer recommended by the Committee on BAJI. (BAJI (cum. pocket pt. 1973) p. 43.) The sole instruction pertaining to the products liability is now contained in BAJI No. 9.00 (BAJI (cum. pocket pt. 1973) p. 37.) Under it, the manufacturer or retailer must be found liable "for injuries proximately caused by a defect in the article which existed when the article left possession of the defendant[s], provided that the injury resulted from a use of the article that was reasonably foreseeable by the defendant[s]."

jury that "[t]he defendant manufacturer of a product is not required under the law so to create and deliver its product as to make it accident proof . . . ." The same instruction also told the jury that in order to establish defendant's liability, plaintiffs had the burden of proving, among other things, that the decedent was "unaware of the claimed defect" and that the "defect, if it existed, made the product unreasonably dangerous and unsafe for its intended use." We have set forth the pertinent language in italics. (See fn. 3, *ante.*)

In accordance with defendant's assertion of the defense of assumption of the risk, the court also gave at defendant's request BAJI No. 4.30 in a modified form.[4] At the same time, at the request of plaintiffs, the court directed the jury that it must consider the "necessities" of the decedent's employment in evaluating his conduct. (BAJI No. 3.40.)[5]

The jury by a vote of 10 to 2 returned a general verdict in favor of Harnischfeger and judgment was entered accordingly. This appeal followed.

---

[4]The instruction stated: "If the decedent, Thomas Jackson Henderson, assumed the risk [of harm] from being struck by the crane cab, plaintiffs may not recover damages for his death resulting therefrom.

"In order for said decedent to have assumed such risk, he must have had actual knowledge of the particular danger of being in the place where he was when struck by the crane cab and an appreciation of the risk involved and the magnitude thereof, and must thereafter have voluntarily assumed such risk.

"For a person to act voluntarily he must have freedom of choice. This freedom of choice must come from circumstances that provide him a reasonable opportunity. without violating any legal or moral duty, to safely refuse to expose himself to the danger in question.

"In determining whether said decedent assumed such risk, you may consider his maturity, intelligence, experience and capacity, along with all the other surrounding circumstances as shown by the evidence.

"This is the doctrine of assumption of risk mentioned in the arguments. The burden of proof is upon the defendant, and that is the burden of proving by the evidence all facts necessary to establish that assumption as I have already defined it for you."

A special assumption of risk instruction in products liability cases is now provided in BAJI No. 9.02. It states in pertinent part: "In order for the plaintiff to have assumed such risk, he must have had actual knowledge of the defect and an appreciation of the risk or danger involved in using the defective product together with an understanding of the magnitude of such risk and must thereafter have voluntarily and *unreasonably* proceeded to use the product to his injury." (Italics added.) The italicized word adds an element not present in BAJI No. 4.30, namely, that the choice of the injured party to encounter a known risk be unreasonable.

[5]The instruction stated: "When a person's lawful employment requires that he work in a dangerous location or a place that involves unusual possibilities of injury, or requires that in the line of his duty he take risks which ordinarily a reasonably prudent person would avoid, the necessities of such a situation, insofar as they limit the caution that he can take for his own safety, lessen the amount of caution required of him by law in the exercise of ordinary care."

It is clear, and the parties agree, that the court's instruction on strict liability in tort (see fn. 3, *ante*) is erroneous in the light of subsequent opinions of this court. After the trial in this case, we rendered our decisions in *Cronin* v. *J.B.E. Olson Corp.* (1972) 8 Cal.3d 121 [104 Cal. Rptr. 433, 501 P.2d 1153] and *Luque* v. *McLean* (1972) 8 Cal.3d 136 [104 Cal.Rptr. 443, 501 P.2d 1163]. *Cronin* held (8 Cal.3d at pp. 134-135) that in proving the existence of a product defect, the plaintiff is not required to establish that the defect made the product "unreasonably dangerous."[6] *Luque* held (8 Cal.3d at p. 146) that in a products liability action the plaintiff does not have the burden of proving that he was unaware of the defect causing the injury.[7]

■ Since on the point covered by our later decision in *Cronin*, plaintiffs requested a substantially similar instruction (see fn. 6, *ante*), they may not now complain of the corresponding portion of the instruction given by the court. (6 Witkin, Cal. Procedure (2d ed. 1971) p. 4258; see and compare *Luque* v. *McLean, supra*, at p. 146.) ■ However, they are not precluded from urging error based on our ruling in *Luque*.

The precise question, therefore, which we must decide is whether this error requires a reversal of the judgment. ■ Generally speaking if it appears that error in giving an improper instruction was likely to mislead the jury and thus to become a factor in its verdict, it is prejudicial and ground for reversal. ■ Witkin, Cal. Procedure (2d ed. 1971) pp. 3056-3057.) **(4)** To put it another way, "[w]here it seems probable that the jury's verdict may have been based on the erroneous instruction prejudice appears and this court 'should not speculate upon the basis of the verdict.'" *(Robinson* v. *Cable* (1961) 55 Cal.2d 425, 428 [11 Cal. Rptr. 377, 359 P.2d 929]; see also *Luque* v. *McLean, supra*, 8 Cal.3d 136, 147; *Vistica* v. *Presbyterian Hospital* (1967) 67 Cal.2d 465, 471 [62 Cal.Rptr. 577, 432 P.2d 193]; *Oettinger* v. *Stewart* (1944) 24 Cal.2d 133, 140 [148 P.2d 19, 156 A.L.R. 1221].) ■ As we observed in *Butigan* v. *Yellow Cab Co.* (1958) 49 Cal.2d 652, 660-661 [320 P.2d 500], "The determination whether, in a specific instance, the probable effect of the instruction has been to mislead the jury and whether the error has been prejudicial so as to require reversal depends on all the circumstances of the case, including the evidence and the other instructions

---

[3]Plaintiffs requested, but the court refused, an instruction directing the jury to find whether defendant sold its product "in a defective condition *unreasonably dangerous* to user or consumer." (Italics added.)

[7]Plaintiffs requested an instruction omitting this element as a part of their affirmative case but the instruction was refused.

given. No precise formula can be drawn." (See also *Bridgman* v. *Safeway Stores, Inc.* (1960) 53 Cal.2d 443, 450 [2 Cal.Rptr. 146, 348 P.2d 696]; *Alarid* v. *Vanier* (1958) 50 Cal.2d 617, 625 [327 P.2d 897].)

Mindful of these principles, we proceed to determine the probable effect of the instruction placing on plaintiff the burden of proving "that the deceased was unaware of the claimed defect" (see fn. 3, *ante*), which instruction, as we have already pointed out, was declared erroneous by us in *Luque.* The essence of our holding there was that the instruction was improper since it told the jury in effect that the plaintiff had the burden of proving that he had *not* assumed the risk of the claimed defect. The almost identical language in the case at bench conveyed the same direction in respect to the decedent's conduct. But the court also instructed the jury as to the defense of assumption of risk, informing them properly that the burden of proving such defense was on defendant.

It is clear at once that the two instructions are contradictory and irreconcilable: The first, purporting to set forth the ingredients of products liability improperly told the jury that plaintiffs had the burden of proving that the deceased was unaware (i.e., that he was not aware) of the claimed defect; the second, setting forth the essentials of assumption of risk, told the jury that defendant had the burden of proving that the deceased was aware of such defect. It is impossible to determine whether the jury returned a verdict for defendant because they found that plaintiffs had failed to prove that the deceased was not aware of the claimed defect or because they found that defendant had proved he was aware of it.

It is also apparent that inclusion of the element of lack of awareness in plaintiffs' case could have given defendant the advantage of a less onerous defense to liability. There was evidence that the decedent was familiar with the working of the crane and that, additionally, he had been warned of the dangerous condition resulting from the operator's obstructed view to the rear. Thus the verdict for defendant could have been based simply on a finding that plaintiffs had not sustained their burden in proving that the decedent was unaware of the defect. Had the jury made such a finding, they would have exonerated defendant manufacturer from liability even if they also believed that the crane was defective in design.[8] Of

[8]The evidence in the present case tending to establish a defect in design was similar in many respects to the facts in *Pike* v. *Frank G. Hough Co.* (1970) 2 Cal.3d 465 [85 Cal.Rptr. 629, 467 P.2d 229], although the latter was based on negligence rather than strict liability in tort. In *Pike* plaintiffs' decedent was struck by a large paydozer while the machine was backing up. Plaintiff, in a wrongful death action, presented evidence to show that the design of the machine obstructed the view of the operator

course, the issue of awareness of the defect represents only one of several elements found in the defense of assumption of risk in a products liability action.[9] At the most, it includes the elements of knowledge and appreciation of the risk. *Luque* demonstrates that more is required; we stated there that " '[t]he only form of plaintiff's negligence that is a defense to strict liability is that which consists in *voluntarily and unreasonably proceeding to encounter a known danger*, more commonly referred to as assumption of risk. For such a defense to arise, the user or consumer must become aware of the defect and danger and still proceed unreasonably to make use of 'the product.' (Italics added.) [Citations.]" (*Luque* v. *McLean, supra*, 8 Cal.3d at p. 145.)[10] The issue of awareness included neither the element of voluntariness nor the element of reasonableness.[11] Thus, apart from the fact 'that plaintiffs were improperly given the burden of proving that decedent was *not* aware of the defect when the burden of proof should have been placed on defendant to prove that the decedent

---

to the rear for a substantial distance and that this deficiency could have been corrected by installation of rearview mirrors. Based on this evidence, we held that whether the product was negligently designed was a question of fact for the jury and therefore reversed a nonsuit in favor of defendant. (See also *Zahora* v. *Harnischfeger Corporation* (7th Cir. 1968) 404 F.2d 172.)

[9]In connection with the defense of assumption of risk asserted by defendant, plaintiffs 'contend that evidence on that issue was so insubstantial that it was error to submit it to the jury. However, we think that the evidence which we have described raised issues of fact on whether the decedent assumed the risk of harm in the product manufactured by defendant.

[10]The description in *Luque* of the type of plaintiff's conduct that will foreclose liability in a products liability action relies on comment "n," section 402A of the Restatement Second of Torts. The comment indicates that the defense it describes is consistent with the rule applied to strict liability cases generally. (See Rest.2d Torts, §§ 515, 524; James, *Assumption of Risk: Unhappy Reincarnation* (1968) 78 Yale L.J. 185, fn. 4; Prosser, Law of Torts (4th ed. 1971) pp. 522-524, 670-671.)

[11]It will be recalled that the court gave an instruction to the jury that the "necessities" of decedent's employment may "lessen the amount of *caution* required of him by law." (Italics added; see fn. 5, *ante*.) One case has suggested that the requirements imposed on an employee in working with a dangerous product may be considered in determining whether the risk was *voluntarily* assumed by the injured employee. (*Rhoads* v. *Service Machine Company* (N.D.Ark. 1971) 329 F.Supp. 367, 381.) It is clear, however, that the amount of care required of decedent would not be relevant to an ordinary contributory negligence defense since such a defense is not a bar to recovery in a strict liability action. (*Luque* v. *McLean, supra*, 8 Cal.3d at p. 145.) Neither is it normally relevant to a defense of assumption of risk, which, if established, will defeat liability regardless of the fact that the injured party may have acted with due care. (*Austin* v. *Riverside Portland Cement Co.* (1955) 44 Cal.2d 225, 235 [282 P.2d 69].) However, the instruction has some bearing on the defense asserted here. As we have explained, the defense requires defendant to prove, among other things, that the decedent encountered the defective product voluntarily and *unreasonably*. Thus the necessities of the decedent's employment may be considered by the jury in deciding whether he proceeded unreasonably in using the product.

*was* aware, it is likely that the jury's verdict may have been based on what was, in effect, a partial defense.

We cannot assume that the jury ignored the first instruction and based its verdict solely on the second. "The prejudicial effect of a *misstatement* of an *important principle of law* cannot easily be overcome by another declaration contradicting it. The jury are bound (and so instructed) to accept the court's instructions as correct statements of the law. . . . They are likely to be confused and misled by the conflicting statements, and it is not easy to determine which charge controlled their determination." (4 Witkin, Cal. Procedure (2d ed. 1971) p. 3055; original italics.) As we observed in the *Robinson, Vistica* and *Luque* cases cited above, we should not speculate on the basis of the verdict.

Defendant contends that the erroneous instruction requiring plaintiff to prove that the deceased was unaware of the claimed defect could not have been prejudicial because the jury had ample evidence to reach the same finding based on the assumption of the risk instruction. Defendant cites no authority supporting this claim and indeed provides us with no analysis of the issue of prejudice apart from the bare statement of the argument. We reject the contention as being misconceived and devoid of merit.

We believe it is misconceived because it savors of arguments made in another context wherein the issue is presented of upholding a general verdict. These latter situations deal basically with the problem of the sufficiency of evidence to uphold a general verdict. They are grounded on the settled rule that a general verdict implies a finding in favor of the prevailing party of every fact essential to the support of his action or defense (*Price* v. *Bekins Van & Storage Co.* (1918) 179 Cal. 326, 328 [176 P. 452]; *Tremble* v. *Tuman* (1917) 175 Cal. 696, 698 [167 P. 142]; 4 Witkin, Cal. Procedure, *op. cit.*, p. 3072). It has therefore been said that "[w]here there are *several counts* or causes of action, a general verdict will stand if the evidence supports it on any one sufficient count." (4 Witkin, Cal. Procedure, *op. cit.*, p. 3078, original italics.) Both this court and the Courts of Appeal have in appropriate instances applied these rules. (See *Gillespie* v. *Rawlings* (1957) 49 Cal.2d 359, 369 [317 P.2d 60]; *Posz* v. *Burchell* (1962) 209 Cal.App.2d 324, 335-336 [25 Cal. Rptr. 896]; *Rather* v. *City & County of San Francisco* (1947) 81 Cal. App.2d 625, 636 [184 P.2d 727].)

But the giving of an improper instruction (as in this matter) or the refusal to give a proper instruction presents a different situation on review.

■ What this court said 50 years ago in *O'Meara* v. *Swortfiguer* (1923) 191 Cal. 12, 15 [214 P. 975] is here germane: "It is true that in determining whether or not a verdict is supported by the evidence, we must assume that the jury accepted the view most favorable to the respondent. However, in determining whether or not the instructions given are correct, we must assume that the jury might have believed the evidence upon which the instruction favorable to the losing party was predicated, and that if the correct instruction had been given upon that subject the jury might have rendered a verdict in favor of the losing party." (See also *Clement* v. *State Reclamation Board* (1950) 35 Cal.2d 628, 643-644 [220 P.2d 897]; *Oettinger* v. *Stewart, supra,* 24 Cal.2d 133, 140.) ■ Our problem in the case at bench is one of the latter kind—involving not the sufficiency of evidence, but rather the effect on the jury of an improper instruction. We are not dealing with separate and independent counts or causes of action and the sufficiency of evidence on any one of them. Nor are we dealing even with separate issues, so independent in nature and isolated in content as to preclude any interrelationship between them. As we have shown, the two issues of strict liability on the one hand and assumption of risk on the other are inherently conjoined by the facts of the accident. More importantly the "awareness" language of the instruction on the strict liability issue amounts to a direction on assumption of risk and thus spills over into that issue. Or to put it another way, the error of the instruction disapproved in *Luque* cannot be isolated and confined to the first issue but infects and taints the issue of assumption of risk. The formula which defendant's argument suggests is not applicable and certainly will not permit us to shortcut our constitutional duty to examine the entire record so as to determine the effect of the challenged instruction. (See *Warner Constr. Corp.* v. *City of Los Angeles* (1970) 2 Cal.3d 285, 300, fn. 18 [85 Cal.Rptr. 444, 466 P.2d 996].) From our examination of the entire record we conclude that the error was prejudicial and resulted in a miscarriage of justice, and that the judgment should be reversed (Cal. Const., art. VI, § 13; see *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

■ Plaintiffs also contend that the court committed error in its instruction on strict liability (see fn. 3, *ante*) in another respect, that is by stating to the jury that the "defendant manufacturer of a product is not required under the law so to create and deliver its product as to make it accident proof." They do not take the position that the above language is a misstatement of substantive law but assert that it is "misleading, confusing and prejudicial;" plaintiffs rely on *Butigan* v. *Yellow Cab Co., supra,* 49 Cal.2d 652. Defendant, on the other hand, seems to have failed to meet

the contention head-on, being content with the argument that the instruction is a "correct statement of applicable law."[12]

As previously indicated the challenged instruction is the introductory language of former BAJI No. 9.01 (see fn. 3, *ante*). We note that former No. 9.01 has been withdrawn by the Committee on BAJI and no longer appears among the currently recommended instructions for products liability cases. Despite this, and notwithstanding our conclusion that the judgment must be otherwise reversed for the reasons just given, we feel obliged to discuss this issue for the guidance of the court on retrial in the event this or similar language is again requested.

At the outset we must say something about the connotation of the words "accident proof" which are the focus of plaintiff's challenge. Generally speaking, they import that the product is incapable of having accidents[13] or not prone[14] to having them, or is or will be free of accidents.[15] This connotation of course implies that the manufacturer is not guaranteeing or insuring that the product will be free of accidents.[16]

*Butigan* was an action for damages for personal injuries sustained by a passenger in a taxicab as a result of its collision with another vehicle. The court, at defendant's request, gave the so-called unavoidable accident instruction, which stated in part: " 'In law we recognize what is termed an unavoidable or inevitable accident. These terms do not mean literally that it was not possible for such an accident to be avoided. They simply denote an accident that occurred without having been proximately caused

---

[12]Defendant directs our attention to the use of similar "accident-proof" language in the following cases although not in connection with the approval or disapproval of instructions: *Pike* v. *Frank G. Hough Co., supra,* 2 Cal.3d 465, 470 (quoting from *Varas* v. *Barco Mfg. Co.* (1962) 205 Cal.App.2d 246, 258 [22 Cal.Rptr. 737]; *Thompson* v. *Package Machinery Co.* (1971) 22 Cal.App.3d 188, 192 [99 Cal.Rptr. 281] (quoting from *Pike*). It also refers to similar language in *Thomas* v. *General Motors Corp.* (1970) 13 Cal.App.3d 81, 88 [91 Cal.Rptr. 301] where in the course of examining an instruction on defective design the court stated that a manufacturer is not required to produce an accident-free or fool-proof machine. Finally reference is made to our opinion in *Cronin* v. *J.B.E. Olson Corp., supra,* 8 Cal.3d 121, 132-134, wherein we recognized that the manufacturer was not to be treated as an insurer of its products.

[13]"Proof," when used as an adjective means "firm or successful in resisting or repelling . . . impregnable — often used in combination (burglar-*proof* windows) (bombproof . . . ." (Webster's Third New Internat. Dict. (1963 ed.) p. 1817.)

[14]See for example "accident-prone" as meaning "having personality traits that predispose to accidents . . . ." (Webster's *op. cit.,* p. 11.)

[15]See *Thomas* v. *General Motors Corp., supra,* 13 Cal.App.3d 81, 88, cited in footnote 12, *ante.*

[16]See reference to *Cronin* in footnote 12, *ante.*

by negligence. . . .' " (49 Cal.2d at p. 657.) We decided that the instruction, in addition to being unnecessary, was confusing because the jury "may get the impression that unavoidability is an issue to be decided and that, if proved, it constitutes a separate ground of nonliability of the defendant. Thus they may be misled as to the proper manner of determining liability, that is, solely on the basis of negligence and proximate causation." (*Id.*, at p. 660.)

The "accident-proof" language, here challenged, although not a model of clarity, simply attempts to convey the concept that a product need not be free from all risk of harm; in other words, it expresses the view that a product need not be found defective simply because an accident has occurred. Following the expression of that concept, the instruction directs the attention of the jury to the elements which must be proved in a products liability action. In the context of the entire instruction, we do not believe that the "accident-proof" language would be regarded as a separate basis of nonliability; in fact, a product defect may or may not exist even though the product fails to be accident proof. We regard the "accident-proof" language as an attempt to delineate the outer limits of legal responsibility in a products liability action. Unlike the so-called unavoidable accident instruction in *Butigan*, it does not appear to us that the challenged language, in the context of the entire instruction, would be confusing to a jury in this particular case. We, of course, cannot and do not assess its potential for confusion in the context of another instruction.

The judgment is reversed.

Wright, C. J., McComb, J., Tobriner, J., Mosk, J., Burke, J., and Clark, J., concurred.