[Civ. No. 44111. Second Dist., Div. One. Mar. 17, 1975.]

MINOKO RIMMELE, Plaintiff and Appellant, v.
NORTHRIDGE HOSPITAL FOUNDATION et al.,
Defendants and Respondents.

**COUNSEL**

Milan Moacanin for Plaintiff and Appellant.

Early, Maslach, Boyd & Leavey, Harry Boyd, Dale D. Billips, Howard E. Hirsch, Shield & Smith and Richard B. Castle for Defendants and Respondents.

## OPINION

**THOMPSON, J.**—In this appeal from a judgment for defendants in a medical malpractice action, appellant contends: (1) the trial court erroneously directed a verdict in favor of defendants Greenberg and King; (2) the court improperly instructed the jury on the doctrine of res ipsa loquitur as applicable to defendant Northridge Hospital Foundation; and (3) the court improperly limited the effect of an answer to interrogatories filed by Northridge. We conclude that the trial court prejudicially erred in instructing on the applicability of conditional res ipsa loquitur to the case at bench and accordingly reverse the judgment as to Northridge Hospital. We affirm the judgment in favor of Greenberg and King.

On August 24, 1969, appellant was admitted to Northridge Hospital for delivery of her second child. She was under the care of Doctors Schein and Greenberg. Dr. Greenberg administered a saddle block anesthetic which proved ineffective. Herbert J. King, a registered nurse anesthetist, administered a general anesthetic. Appellant was delivered of a healthy baby girl by Dr. Greenberg without apparent complications. In the course of her confinement and after delivery, appellant was administered several injections in her right buttock by nurses, agents of Northridge Hospital and solely under its control. Appellant was discharged from the hospital on August 27.

On August 30, appellant experienced severe pain in her right hip which prevented her from walking. The pain became worse and appellant developed chills and fever. Dr. Greenberg readmitted her to Northridge Hospital that day. Appellant's temperature was 101 degrees. She had objective evidence of induration and marked tenderness in the right buttock and a slight "shift of blood count to the left." A tentative diagnosis of postpartum pyelonephritis was dispelled by testing, and Dr. Greenberg requested consultation of an orthopedist. His tentative diagnosis was that appellant had developed "a small deep-seated abscess in the region of the previous injections into the right buttock." Treatment with antibiotics reduced the fever, and appellant was again discharged from the hospital. Dr. Greenberg's diagnosis upon appellant's discharge

was "acute peripheral neuritis, probably secondary to injections that she received in the right buttocks [*sic*] during labor and postpartum."

Treatment of appellant continued after her discharge from Northridge Hospital. Dr. Greenberg and a treating radiologist, orthopedist, and neurosurgeon agreed that appellant suffered from spinal osteomyelitis (degeneration of the bone) and probable involvement of the sciatic nerve due to an infection originating in the tissue of the right buttock and spreading to the bone. All agreed also that the probable cause of the infection lay in the injections administered to appellant while she was in the hospital.

Appellant filed a complaint in malpractice commencing the case at bench. She named as defendants Northridge Hospital, Drs. Schein and Greenberg, and Mr. King. Her evidence at trial consisted of testimony of the various treating physicians in the tenor of the facts recited above. She also produced competent testimony that an injection given in the right buttock would not, without negligence, result in the condition from which appellant suffered. The trial court limited the admissibility of an answer to interrogatories filed by Northridge Hospital to the effect that Dr. Greenberg had supervised and controlled the conduct of the nurses in administering the injection. It ruled that the answer was admissible against the hospital but not against Dr. Greenberg. The trial court granted a nonsuit as to Dr. Schein which is not questioned on this appeal. It heard evidence presented by Northridge Hospital in the form of expert opinion of an internist who had not examined appellant that appellant did not acquire the infection as a result of an injection. The expert opinion was based upon the assumption that an injection would not be given by a competent nurse in an area of the buttock in which the infection occurred. The expert called by Northridge Hospital presented the thesis that the injury to appellant was probably caused by an infection of the uterus incident to childbirth.

The trial court granted a directed verdict as to Dr. Greenberg and Mr. King. Over appellant's assertion that she was entitled to an unconditional res ipsa loquitur instruction or, alternatively, that if a conditional instruction were given the only condition to the application of the doctrine not established as a matter of law was whether the injury is of a kind which ordinarily does not occur in the absence of negligence, the trial court instructed the jury in terms of BAJI Nos. 6.35 and 4.02 (1970 Revision).[1] Those instructions permitted the jury to infer negligent

---

[1]"BAJI 6.35 MEDICAL MALPRACTICE—conditional RES IPSA LOQUITUR [¶]

conduct on the part of Northridge Hospital from the injury to appellant only if the jury first found that the injury was of a kind that ordinarily does not occur in the absence of negligence, the injury was caused while appellant was under the exclusive care or control of the hospital, and the injury was not due to any voluntary action or contribution on her part.

After it had retired to deliberate, the jury asked that it be read the answer of Northridge Hospital to interrogatories propounded to it by appellant. One of those answers claimed that the nurses were "under the direction or supervision" of Dr. Greenberg in administering the injections. The answer was read to the jury in response to its request and over appellant's objection. The jury returned a verdict for Northridge Hospital and against appellant. This appeal from the judgment entered on that verdict and the directed verdicts in favor of Dr. Greenberg and Mr. King followed.

■ No error is present in the judgments for Dr. Greenberg and Mr. King. Appellant's sole theory of recovery is that her injury resulted from the negligent administration of injections to her right buttock. Neither Dr. Greenberg nor Mr. King administered any injection there and there is no evidence that either was the principal of any nurse who administered that treatment.

■ Nor did the trial court err in excluding as evidence against Dr.

---

You must decide the following question[s] concerning the injury involved in this case: [¶] Is it the kind of injury which ordinarily does not occur in the absence of negligence? [¶] [Whether the injury is one which ordinarily does not occur in the absence of negligence is to be determined from the evidence presented in this trial by physicians and surgeons called as expert witnesses.] [¶] Was the injury caused while the plaintiff was exclusively under the care or control of the defendant? [The plaintiff is not required to identify the particular agency or instrumentality which caused the injury if he is unable to do so because of his physical condition at the time the treatment was administered.] [¶] Was the injury due to any voluntary action or contribution on the part of the plaintiff which was the responsible cause of his injury? [¶] If, and only if, you find that the plaintiff's injury was of a kind which ordinarily does not occur in the absence of negligence; that it was caused while the plaintiff was exclusively under the care or control of defendant; and that it was not due to any voluntary action or contribution by the plaintiff which was the responsible cause of his injury, you are instructed as follows:"
"BAJI 4.02 (1970 REVISION) RES IPSA LOQUITUR—WHERE ONLY A PERMISSIBLE INFERENCE OF NEGLIGENCE [¶] From the happening of the [injury] involved in this case, you may draw an inference that a [legal] cause of the occurrence was some negligent conduct on the part of the defendant. [¶] However, you shall not find that a [legal] cause of the occurrence was some negligent conduct on the part of the defendant unless you believe, after weighing all the evidence in the case and drawing such inferences therefrom as you believe are warranted, that it is more probable than not that the occurrence was caused by some negligent conduct on the part of the defendant."

Greenberg the interrogatory answer of Northridge Hospital which, if admissible against him, would have cured the fatal deficiency. "The answers of one party . . . elicited in response to interrogatories . . . cannot be used as evidence against [another] party . . . ." (*Petersen* v. *City of Vallejo,* 259 Cal.App.2d 757, 776 [66 Cal.Rptr. 776]; Code Civ. Proc., §§ 2030, subd. (b), 2016, subd. (d).)[2]

The court, however, erred in instructing the jury on the application of the doctrine of res ipsa loquitur.

The doctrine transfers to the defendant the burden of producing evidence negating negligence or proximate cause, and permits an inference of negligence and proximate cause even in the situation where the defendant carries his burden. (Evid. Code, § 646.) In California, the doctrine is applicable where: (1) the injury is of a kind which ordinarily does not occur in the absence of negligence; (2) the injury is caused by an instrumentality within the exclusive control of the defendant or group of defendants; and (3) the injury was not due to any voluntary action or contribution by the plaintiff. (*Ybarra* v. *Spangard,* 25 Cal.2d 486, 489 [154 P.2d 687, 162 A.L.R. 1258].) Stated less mechanically, a plaintiff suing in a personal injury action is entitled to the benefit of res ipsa loquitur when: "the accident is of such a nature that it can be said, in the light of past experience, that it probably was the result of negligence by someone and that the defendant is probably the person who is responsible." (*Zentz* v. *Coca Cola Bottling Co.,* 39 Cal.2d 436, 446 [247 P.2d 344]; see also *Bardessono* v. *Michels,* 3 Cal.3d 780, 788, fn. 5 [91 Cal.Rptr. 760, 478 P.2d 480, 45 A.L.R.3d 717].)

"Where the facts giving rise to the doctrine [of res ipsa loquitur] are established as a matter of law but the defendant has introduced evidence sufficient to sustain a finding either of his due care or of a cause for the accident other than his negligence, the presumptive effect of the doctrine vanishes. Except in those rare cases where the inference is dispelled as a matter of law, the court may instruct the jury that it may infer from the established facts that negligence on the part of the defendant was a proximate cause of the accident. . . . [¶] . . . The defendant may introduce evidence that both attacks the basic facts that underlie the doctrine of res

[2]Since the date of *Petersen* v. *City of Vallejo,* Code of Civil Procedure section 2030 has been amended to require service of copies of interrogatories and answers on all parties who have appeared "solely for their information." Because of the limited purpose of service of interrogatories and answers, the amendment does not affect the rationale of *Petersen.*

ipsa loquitur and tends to show that the accident was not caused by his failure to exercise due care. Because of the evidence contesting the presumed conclusion of negligence, the presumptive effect of the doctrine vanishes, and the greatest effect the doctrine can have in the case is to support an inference that the accident resulted from the defendant's negligence. [¶] In this situation, the court should instruct the jury that, if it finds that the basic facts have been established by a preponderance of the evidence, then it may infer from those facts that the accident was caused because the defendant was negligent. . . ." (Law Revision Com. comment on Evid. Code, § 646; see also *Albers* v. *Greyhound Corp.*, 4 Cal.App.3d 463, 474 [84 Cal.Rptr. 846].)

█ It follows that where part of the facts basic to the application of the doctrine of res ipsa loquitur is established as a matter of law but that others are not, the court should instruct that application of the doctrine by the jury depends only upon the existence of the basic facts not conclusively established. (See *Roddiscraft, Inc.* v. *Skelton Logging Co.*, 212 Cal.App.2d 784, 794 [28 Cal.Rptr. 277]; *Kite* v. *Coastal Oil Company*, 162 Cal.App.2d 336, 344 [328 P.2d 45].)[3]

█ Here the evidence established as a matter of law that Northridge Hospital was in exclusive control of the instrumentality that caused the injury and that the injury was not due to voluntary action or contribution by appellant. Stated in the terms of the less mechanistic formula, the evidence establishes as a matter of law that if the injury was caused by negligence Northridge Hospital was probably the entity responsible. The record is uncontradicted that no one other than Northridge Hospital and its agents had anything to do with the conduct causing injury to appellant. The trial court confirmed that proposition by granting a nonsuit to Dr. Schein and a directed verdict to Dr. Greenberg and Mr. King. There is not the slightest evidence that anything that appellant did in any way contributed to her injury. (See *Shahinian* v. *McCormick*, 59 Cal.2d 554, 559-560 [30 Cal.Rptr. 521, 381 P.2d 377].)

The trial judge, however, placed before the jury as issues of fact questions which the record established as matters of law. He instructed in the three factor formula of conditional res ipsa loquitur, leaving it to the jury to decide whether two of the conditions to the application of the

---

[3]Because we here conclude that the conditional res ipsa loquitur instruction as given was prejudicially erroneous, we do not reach the issue of appellant's right to an unconditional instruction on the doctrine. That issue must be determined on the basis of the evidence presented on retrial.

doctrine were present when in fact they were established conclusively. While its sole task in determining the basis for the inferences permitted by res ipsa was consideration of the question of whether the injury was one that ordinarily would not occur in the absence of negligence, the jury was invited by the instruction to speculate that Northridge Hospital was not in exclusive control of the injections or that some action of appellant herself contributed to the injury. Thus the trial court erred in its instruction to the jury by erroneously increasing appellant's burden.

The error was prejudicial. ▌ Prejudicial error is established where the record as a whole reveals a reasonable probability that a result more favorable to the appealing party would have been reached in the absence of the error. (*People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].) "Generally speaking if it appears that error in giving an improper instruction was likely to mislead the jury and thus to become a factor in its verdict, it is prejudicial and ground for reversal . . . . '[W]here it seems probable that the jury's verdict may have been based on the erroneous instruction prejudice appears and [the reviewing] court "should not speculate upon the basis of the verdict." ' " (*Henderson* v. *Harnischfeger Corp.,* 12 Cal.3d 663, 670 [117 Cal.Rptr. 1, 527 P.2d 353], quoting *Robinson* v. *Cable,* 55 Cal.2d 425, 428 [11 Cal.Rptr. 377, 359 P.2d 929].)

▌ Here the instruction was likely to mislead the jury and to become a factor in its verdict. The jury was informed that there were factual issues relating to the exclusive control by Northridge Hospital of the procedure which appellant claimed was the cause of her injury and to appellant's own contribution to her condition. Here, there also is a strong indication that the jury's verdict may have been based on the erroneous instruction. During its deliberations, the jury asked that Northridge's self-serving and hence inadmissible answers to interrogatories going to the subject of control and supervision by Dr. Greenberg of the giving of injections by the nurses be reread. They were read over appellant's objection. It is fairly inferred from the jury's interest in those answers that the jury members were considering the possibility that Northridge Hospital was not in exclusive control, when it was as a matter of law.

Focusing on the opinion evidence of the defense expert, Northridge Hospital argues that it has established such a strong case of absence of negligence that no miscarriage of justice resulted from the defense verdict no matter how erroneous the instructions to the jury may have been. The argument ignores the fact that the expert's testimony was

based upon his assumption that an injection was not administered to appellant in a place where it could have caused the infection. Misplacement of the injection was, however, one of the very acts of negligence which the hospital was required to go forward to rebut if the doctrine of res ipsa loquitur is applicable.

Taking the opposite tack, respondent Northridge Hospital also argues that the record is so clear that it was in exclusive control of the injection procedure and that appellant did not herself contribute to the injury that it must be assumed that the jury did not question the existence of those ultimate facts. That argument invites us to indulge in the speculation concerning the jury's thought process that has been condemned by our Supreme Court. (*Henderson* v. *Harnischfeger Corp., supra,* 12 Cal.3d 663, 670.)

In summary, the record of the case at bench discloses a close case in which an instruction likely to mislead was given to the jury and where it is probable that the verdict may have been based upon the instruction. Prejudicial error is thus established.

The judgment is reversed as to respondent Northridge Hospital Foundation and otherwise affirmed. Appellant to recover her costs from Northridge Hospital Foundation. Respondents Greenberg, Schein and King to recover their costs from appellant.

Lillie, Acting P. J., concurred.

**HANSON, J.,** Concurring and Dissenting.—While I concur in the majority opinion insofar as it affirms the directed verdicts in favor of Dr. Greenberg and Mr. King, I dissent from the reversal of the judgment as to respondent Northridge Hospital Foundation. I would also affirm that judgment.

## CONTENTIONS

The trial court as part of BAJI No. 6.35 (Medical Malpractice—Conditional Res Ipsa Loquitur) instructed the jury on the three elements upon which the doctrine of res ipsa loquitur is conditioned, namely, (1) that the plaintiff's injury was of a kind which ordinarily does not occur in the absence of negligence; (2) that it was caused while the plaintiff was exclusively under the care or control of defendant; and (3) that it was not due to any voluntary action or contribution by the plaintiff which was the responsible cause of his injury.

On appeal, plaintiff asserts that the failure of the trial court to instruct the jury, as a matter of law, that elements (2) and (3) above had been established constituted reversible error, particularly with reference to condition (2), because of the answers by respondent Hospital to interrogatories propounded by the plaintiff, which were read to the jury, that the nurses were "under the direction or supervision" of Dr. Greenberg in light of the directed verdict in favor of Dr. Greenberg.

## DISCUSSION

The general rule is that error is not reversible unless it is prejudicial and by reason of such error a different result would have been probable,[4] which resulted in a miscarriage of justice.[5]

The court's instruction, if given, that elements (2) and (3) above had been established as a matter of law would have had to have been based on the same evidence the trier of fact (the jury) heard and the same principles of law of which they (the jurors) were instructed. "It must be assumed that the jury understood the instructions and correctly applied them to the evidence." (*Zuckerman* v. *Underwriters at Lloyds*, 42 Cal.2d 460, 478-479 [267 P.2d 777].)

One answer by the defendant hospital to plaintiff's interrogatories which was read to the jury is singled out. It cannot be viewed in a vacuum but must be viewed in light of the totality of the evidence, direct and indirect. The plaintiff propounded the questions; the defendant hospital answered the questions. They were placed into evidence. The

---

[4]Code of Civil Procedure, section 475 provides in toto: "The court must, in every stage of an action, disregard any error, improper ruling, instruction, or defect, in the pleadings or proceedings which, in the opinion of said court, does not affect the *substantial rights* of the parties. No judgment, decision, or decree shall be reversed or affected by reason of any error, ruling, instruction, or defect, unless it shall appear from the record that such error, ruling, instruction, or defect was *prejudicial*, and also that by reason of such error, ruling, instruction, or defect, the said party complaining or appealing sustained and suffered substantial injury, and that a *different result would have been probable* if such error, ruling, instruction, or defect had not occurred or existed. *There shall be no presumption that error is prejudicial*, or that injury was done if error is shown." (Italics added.)

[5]California Constitution, article VI, section 13 provides: "No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, *unless*, after an *examination of the entire cause, including the evidence*, the court shall be of the opinion that the error complained of has resulted in a *miscarriage of justice.*" (Italics added.)

jury was entitled to have the evidence reread.[6] The respondent has no basis in fact that the one answer to the interrogatories, singled out, influenced the jury's verdict.[7] The direct testimony of the Nurse Juanita Uy clearly showed that the nurses are employed by the hospital and that it was a matter of discretion with the nurses where injections were to be given and not the doctors.[8] The interplay of the evidence and the

[6]"THE COURT: Ladies and gentlemen, first of all, I note, Mr. Scott, you are the foreman; is that correct, sir?
"MR. SCOTT: Yes, sir.
"THE COURT: I have your question here. 'Are the interrogatories available to review?'
"First of all, let me ask, Mr. Scott, are you talking about all of the interrogatories that were read into evidence or just some of them?
"MR. SCOTT: The interrogatories that were read into evidence is what he wanted to review. One member was interested in learning about the injections, for instance, which were discussed.
"THE COURT: I see.
"Well, I can have the reporter go to that portion of the transcript or the proceedings in her notes and have it read back to you, but the reason I am inquiring is that there may have been different areas covered by the interrogatories, so you want to hear all of them, is that it?
"MR. SCOTT: I believe there was an interest in all of those."

[7]"THE COURT: Mr. Moacanin, do you believe the jury decided this case on the basis that this plaintiff was—They found the plaintiff was not exclusively under the care of the nurse when the injection was given? Do you believe that is truly why the jury came to the conclusion it came to?
"MR. MOACANIN: Well, to answer your question directly, I do not know. We cannot know and, as a matter of fact, interestingly that happened after the jury was discharged. They wouldn't talk to neither me nor Mr. Dyer, which is the first time that happened to me, and it was a great surprise to us lawyers, that they wouldn't comment and explain how they arrived at the verdict, but I would say that certainly—
"THE COURT: They would not talk to you?
"MR. MOACANIN: They would not talk to neither me nor Mr. Dyer and they just filed out and said, 'We don't want to talk,' . . . ."

[8]"Q Now, as of August 24th of 1969, were you employed as a registered nurse by the Northridge Hospital Foundation?
"A Yes, I am.
"Q And at that time what department in the hospital were you assigned to?
"A In the maternity section.
"Q And as of August 24th of 1969, were you familiar—First of all, did the hospital have a policy or routine that was followed for the preparation of medications to be administered intramuscularly to a patient by injection?
"A Yes, we had.
"Q What was that procedure?
"A Well, we have this medication card. We check the medication and then if it is like for injection, we take a sterile syringe and needle and the medication. We open the ampules, then we open the sterile syringe and we draw the medication.
"We go to the patient with this medication all prepared in a tray, with alcohol sponges, and then we go to the patient, read the name to the patient, who the patient is, and then make sure the medication is for this patient, and then we give it intermuscularly either left or right upper outer quadrant of the buttock.
"Q In other words, assuming that—usually do the orders of the doctor indicate where

applicable principles of law were undoubtedly covered in final argument by the competent trial lawyers, as was indicated during oral argument on appeal. The trial court gave this matter careful consideration on three separate occasions when this issue was first raised during the trial, following the jury's request for the rereading of the interrogatories[9] and again during the motion for a new trial.

Since we must assume that the jury understood the instructions and correctly applied them to the evidence, and that elements (2) and (3) were established by the evidence, was there substantial evidence upon which the jury could base a finding that condition (1) was not established? Yes.

The testimony of Dr. William L. Hewitt, with 20 years experience as an internist, a subspecialty of infectious diseases and the head of that division at UCLA Medical School, called by the defense as an expert, constituted substantial evidence upon which the jury could have based a finding that condition (1) above was not established. Dr. Hewitt on direct examination testified that, based on a review of pertinent hospital records, doctors' reports and X-rays, the plaintiff did not acquire any infection as a result of injections. He based his opinion primarily on two reasons which he explained to the jury.[10]

---

the injection is to be given or is this a matter of discretion with the nurses?

"A It is a matter of discretion for the nurse."

[9]"THE COURT: 'Under whose direction or supervision said injection was administered.'

"Now, I don't think that question in and of itself precludes the jury or would suggest to the jury that the patient was under the control of someone else at the time the injection was given.

"I think it would be my feeling in viewing the evidence and the reasonable inferences to be drawn therefrom, that at the time the nurse gave the injection the patient was under her exclusive control. I don't think there really should be any question in the jury's mind that that was so.

"In other words, based upon personal experience, I am sure we have all had the same experience, we have a shot, whoever is giving it says, 'Lower your pants,' or, 'Roll up your sleeve,' and you then take your directions from them, and they have control of you.

"Now, as far as whether the doctor ordered the injection I think is one step beyond that. I frankly don't think that the jury should be advised further at this point unless they seek some advise [sic]. ·

"I think I would be committing error either for or against one of the parties in commenting upon the control element in the case unless they specifically request what effect if any does the dismissal or the directed verdict of Dr. Greenberg have upon the control exercised over the patient.

"Now, if they came up with that question, then, of course, I would be called upon to give them by observations."

[10]"Q Doctor, based upon your review of the X-rays and the medical records, have you arrived at an opinion with regard to whether or not the plaintiff in this action contracted

The record reflects that the plaintiff has had her full day in court under our adversary system of justice. She had a jury trial in a courtroom fairly presided over by an experienced judge who adequately instructed in the law of the case. She was represented by competent counsel.

---

an infectious disease as a result of an injection or several injections into the right buttock?

"A Yes.

"Q What is your opinion, Doctor?

"A I do not believe she acquired any infection as a result of injections.

"Q What are the reasons that you base this opinion upon?

"A Well, first of all, I think there is a pretty good alternative explanation, which I can go into if you wish me to.

"Q Certainly.

"A Second, I think that the location of the infection demonstrated by x-rays would be extremely difficult to acquire by means of any injection.

". . . . . . . . . . . . . . .

"THE WITNESS: As you look at this x-ray from the side of the body, what you see here is the front of the patient, the front of the individual, and then—and here is the bone that you feel right down in the front, and right back of that is the bladder, and then coming in down here is the vagina, and swinging up over the bladder is the uterus. Back of that is the rectum, and back of that is the sacrum.

"The drainage—the normal venous drainage and the lymphatic drainage—that is the drainage of the body fluids from the area of the bladder and the vagina and uterus and the rectum go back to a formation of veins and drainage that lies right behind the rectum, between the rectum and the sacrum and the spine, and for that reason infections which occur in the bladder and in the vagina and uterus and in the rectum may be associated with osteomyelitis; particularly of the spine, and that is why, say, in pyelonephritis or acute kidney infections osteomyelitis of the spine is more common than any other kind of osteomyelitis because this drainage of material which may be infected in it and the bacteria tends to go back into this portion of the body.

"Now, I think that that is really the story and the explanation for this area which is probably osteomyelitis in this patient; namely, that because there is a certain amount of infection normally present in the uterus at the time of delivery, and at the time of an episiotomy, that at the time of delivery some of these organisms drain back to this area of the spine and establish an infection there which was with an organism commonly resident in the uterus; this is sensitive to ampicillin and despite the fact that usually this type of disease does not respond to brief periods of therapy, that this treatment was sufficient in this patient for her to control her disease.

"It is possible that if she had been treated more vigorously with antibiotics she might have responded more rapidly than she had and not have had pain as long, but nevertheless her defenses and brief period of treatment which she had were sufficient to control the infection of bone.

". . . . . . . . . . . . . . .

"THE WITNESS: The point that I make with regard to the area of the inflamatory process being difficult to reach by a needle, is indicated by this area. (Indicating)

"Now, if you realize that this is the midline of the back, then if you—with your own hand, just feel where that main projection of the sacrum comes out in your back, obviously this is a distance of only about two or two and a half inches from the midline—well, it is going to be very difficult for an injection, which is giving the needle out in the outer portion of the buttock—that is, in this portion of the buttock, or even in this portion of the buttock, it is going to be very difficult to get a needle into this area because the usual length of the needle is, say, an inch and a half or two inches, and it is just—

After reviewing the entire record on appeal, I cannot say that the error, if any, was prejudicial and that the result would probably be different on retrial or that there was a miscarriage of justice.

For the reasons stated, I would also affirm the jury verdict in favor of defendant Northridge Hospital Foundation.

---

"This is just not that close to where a needle can get if it is stuck into the tissues out here, so that this is not an area which is really approximate or close to the area where an injection would ordinarily be given.

"Furthermore, this bone is right underneath the skin, and anybody who is going to give—a nurse or professional person who is going to give an injection is highly unlikely, I would think, to attempt to put a needle right into a place where a bone is right underneath the skin.

"So that is the basis for my saying that I think that this area in which the inflamatory process has occurred is really quite distant from where one would ordinarily make an injection."