Filed 8/10/21  Melendez v. Los Angeles Unified School Dist. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| JESUS E. MELENDEZ,<br><br>      Plaintiff and Appellant,<br><br>      v.<br><br>LOS ANGELES UNIFIED SCHOOL DISTRICT,<br><br>      Defendant and Appellant. | B295052<br><br>(Los Angeles County Super. Ct. No. BC635349) |
| JESUS E. MELENDEZ,<br><br>      Plaintiff and Appellant<br><br>      v.<br><br>LOS ANGELES UNIFIED SCHOOL DISTRICT,<br><br>      Defendant and Respondent. | B298588 |

APPEALS AND CROSS-APPEAL from a judgment and an order of the Superior Court of Los Angeles County.  Randolph M. Hammock, Judge.  Affirmed in part, reversed in part, vacated in part, and remanded.

Hadsell Stormer Renick & Dai, Dan Stormer, Brian Olney; Toni Jaramilla, Toni J. Jaramilla and May Mallari for Plaintiff and Appellant.

Ballard Rosenberg Golper & Savitt, Linda Miller Savitt, Elsa Bañuelos and John J. Manier for Defendant and Appellant and for Defendant and Respondent.

———————————

Beginning in 2009, Jesus E. Melendez, an assistant general counsel in the Office of the General Counsel of the Los Angeles Unified School District (LAUSD) applied for three positions within the Office of the General Counsel and for the position of Personnel Director. All would have been promotions. Melendez was not selected for any of the four positions. He filed a second amended complaint with eight causes of action, alleging he was denied the promotions due to his age and his Mexican and/or Latino origin. He alleged he was denied the promotions in retaliation for a Department of Fair Employment and Housing (DFEH) complaint he had filed in 2003 and correspondence he had sent in 2008 to LAUSD's General Counsel complaining about the budgetary lay-off of a Latina attorney. Melendez also alleged a violation of the Labor Code for being paid less than non-Latino attorneys who performed the same work.

The trial court denied summary judgment but granted summary adjudication in favor of LAUSD on all of Melendez's Fair Employment and Housing Act (FEHA) claims, except for his claims LAUSD was motivated by retaliation in denying him the Personnel Director position, his declaratory and injunctive relief cause of action, and his failure-to-prevent cause of action. This

2

summary adjudication disposed of the first, second, and third causes of action in their entirety.

As to the two causes of action alleging violations of Labor Code section 1197.5, the court treated the summary judgment motion as one for judgment on the pleadings and granted it without leave to amend. The declaratory and injunctive relief cause of action were also adjudicated against Melendez. Only Melendez's FEHA retaliation cause of action as to the Personnel Director position went to trial, and a jury found in favor of Melendez and awarded him $210,833.00 in damages. The trial court also awarded him attorney fees.

LAUSD appeals from the judgment and from the trial court's denial of its motion for judgment notwithstanding the verdict. Melendez cross-appeals from the order granting summary adjudication and judgment on the pleadings. LAUSD separately appeals the attorney fees award. The initial appeal and cross-appeal have been consolidated with LAUSD's attorney fees appeal.

We affirm summary adjudication of the FEHA causes of action and judgment on the pleadings of the Labor Code retaliation cause of action. We reverse the judgment on the pleadings of the Labor Code unequal pay cause of action and remand it with leave to amend. As to the FEHA retaliation cause of action that went to the jury, we hold the trial court erred in instructing the jury that it could award non-economic damages. We find it reasonably probable the jury made such an award. We strike the damage award, but the judgment of liability otherwise stands. In light of these rulings we vacate the attorney fees award and remand the matter to the trial court to determine whether Melendez is a prevailing party in this mixed motive case

3

and whether he is therefore entitled to attorney fees.  After the damage award, Melendez did not pursue declaratory or injunctive relief as to the FEHA retaliation cause of action.  We conclude he has forfeited his right to seek such relief on remand.

## FACTUAL AND PROCEDURAL BACKGROUND

A. **Melendez's Career Before Joining LAUSD**

Melendez was born in Mexico and moved to the United States with his mother at the age of 6.  He graduated from the University of Southern California and then, in 1971, from USC's law school.

After graduating from law school, Melendez worked as a legislative assistant to United States Senator John Tunney for about two years, working on the Equal Opportunity Act and the Bilingual Courts Act.  In 1973, Melendez began work as a staff officer at the national office of the Mexican American Legal Defense Fund (MALDEF).  He was soon promoted to Director of the Los Angeles office.

In 1974, Melendez was admitted to the California Bar. From 1974 to 1979, he worked as a Deputy County Supervisor for Los Angeles County.  From 1979 to 1984, Melendez served as the District Director of the United States Equal Employment Opportunity Commission (EEOC) for Southern California, Nevada, Arizona, Utah and New Mexico.

B. **Employment at LAUSD**

In 1984, Melendez went to work as a staff attorney for LAUSD's Office of the General Counsel (OGC).  He was one of only three staff attorneys.  At the time, LAUSD attorneys were "certificated" employees as opposed to "classified" employees.

4

Certificated employees must obtain certification to fill their position; generally certificated employees are teachers, nurses and school counselors, but professional administrative employees may also be certificated. Classified employees are part of LAUSD's merit system. By 2000, staff attorneys numbered between six and eight.

In 2001, OGC underwent a major expansion and reorganization. Attorneys were divided into teams based on specialties and practice areas. OGC established two higher level positions for attorneys: Associate General Counsel I (AGC I) and Associate General Counsel II (AGC II). At that time, all AGC I's were hired to and did work on the Facilities team to support LAUSD's multi-billion dollar new school construction projects. The AGC II's held higher level positions and acted as team leaders for the various teams. All attorneys hired after that date were "classified" rather than certificated employees. As classified employees they operated under LAUSD's merit system, which is run by the Personnel Commission, and is governed by Education Code sections 45240–45320. In contrast, certificated employees fall under the purview of the Division of Certificated Human Resources.

By 2003, there were 42 attorneys at OGC. Melendez estimated there were only two Mexican-American attorneys at OGC in 2003: himself and Robert Cuen. There were no Latino attorneys in management positions. Melendez believed he and Cuen, who was also a certificated employee, were paid less than

5

classified attorneys doing the same work but who were not Mexican-American.[1]

On August 20, 2003, Melendez and Cuen wrote a letter to the LAUSD Superintendent detailing the disparate pay and lack of Mexican-Americans in management positions. On August 26, 2003 they filed a DFEH complaint. The Acting General Counsel then undertook a review of the OGC compensation structure and recommended that the pay disparity between Mexican-American attorneys and other attorneys doing the same work be eliminated. In September 2003, the LAUSD Superintendent agreed.

At some point, probably in 2008, the title for entry level attorneys changed from staff attorney or staff counsel to Assistant General Counsel. Melendez's title changed accordingly.

In 2008, LAUSD laid off Georgina Verdugo, a Mexican-American attorney hired four years earlier as an AGC II for the Government Services team. According to Melendez, the stated reason for the lay-off was "budgetary reasons." To Melendez's knowledge no one else was laid off at that time, and no one else had ever been laid off from OGC for budgetary reasons. Melendez sent an email to the General Counsel and members of the LAUSD School Board protesting Verdugo's removal and claiming it was evidence of discriminatory animus towards Mexican-Americans. There is nothing in the record on appeal to show that the laid-off attorney herself made such claims.

---

[1] Although Melendez had the option to convert to classified status, he chose not to do so because he would lose the seniority protection he enjoyed as a certificated employee.

6

1. *First Promotion Denial:  Labor and Employment Services Team AGC I*

In 2009, Melendez applied for a newly created AGC I position on the Labor and Employment Services team.  The selection process for the position consisted of an oral examination in the form of a technical interview of each applicant, conducted by County Counsel attorneys to ensure objectivity.  Applicants were scored and LAUSD generated a ranked eligibility list.  Alexander Molina and James Hunt were tied for first.  Melendez was ranked second.  LAUSD rules generally require that a position be filled from the top three candidates.  If a certification is required, lower ranked candidates may be chosen.  Molina and Melendez had certifications in employment litigation; Hunt did not.

General Counsel Roberta Fesler selected Molina for the position.  Fesler selected Molina for a number of reasons: he was the top ranked candidate and had the appropriate legal certification, and he was already on the Labor and Employment Services team.  Melendez was on the Business and Government Services team at the time.

2. *Second Promotion Denial:  Personnel Director*

In the summer of 2010, Melendez began the process of applying for Personnel Director.  Melendez advanced through three stages of interviews.  After the interview process, the top three candidates were Janalyn Glymph, Kathleen Collins and Melendez.  All three candidates were interviewed by three personnel commissioners: Joseph Paller, Mark Vargas and Robert Manley.  In June 2011, the commissioners selected Glymph to be Personnel Director.  In 2006, Glymph had previously interviewed for the position.  According to Paller,

7

Glymph would have been chosen for the position in 2006, but she was unable to commit to the five-year term that the Commission wanted.

At some point in the summer or fall of 2011, Melendez obtained a copy of a due diligence report prepared about him in connection with his application for the Personnel Director position. It was undisputed LAUSD created this report and provided it to outgoing Personnel Director Wendy Macy and personnel analyst Anna Forsberg. The first page of the report states that the Office of the Inspector General (OIG) has "found a significant issue in the Media section on page 2. The OIG encourages management to read the entire report and draw its own conclusion." The Media section contained an article about Melendez's 2003 DFEH complaint about unequal pay.

Melendez stated in a declaration that after he was not promoted to Personnel Director, outgoing Personnel Director Wendy Macy told him the personnel commissioners "had been provided with information regarding my 2003 DFEH charge." Melendez testified more specifically at his deposition that Macy contacted him and told him the report had been provided to the personnel commissioners and they had read it.

3. *Third Promotion Denial: Business and Government Team*

According to Melendez, he learned in August 2011 that General Counsel David Holmquist had selected James Hunt to be promoted to an AGC I position on the Business and Government Services team, the same team Melendez was on. Holmquist used the eligibility list for the 2009 AGC I position and did not conduct new interviews. Although eligibility lists typically remain valid

8

for a year, they can be extended for up to three years. LAUSD offered evidence that the 2009 list was still valid in 2011.

Melendez spoke with his team leader, Greg McNair, about Hunt's selection, and McNair said Holmquist had asked him if he thought Hunt could do the job and McNair replied yes. McNair stated that it was Holmquist's decision to promote Hunt.

4. *Fourth Promotion Denial: Labor and Employment Services Team AGC II*

In October 2011, Melendez applied for an open AGC II position on the Labor and Employment Services team created by Kathleen Collins's departure from LAUSD. This position was filled on an interim basis by Molina. It was a senior management position and so would be filled from an unranked eligibility list. The Personnel Commission reviewed applications, determined that Molina, Cuen, Melendez and John Walsh were qualified for the position and placed them on an unranked eligibility list. Walsh withdrew shortly after the list was created. The three remaining applicants were interviewed by three different panels consisting of (1) OGC team leaders; (2) clients of the Labor and Employment Services team; and (3) team members in the Labor and Employment Services team. All three panels gave Molina a "highly recommended" rating. The "team members" panel gave Melendez a "not recommended" rating. The other two panels gave Melendez a "recommended" rating. Holmquist selected Molina for the position.

C. **2011 DFEH Complaint**

On November 28, 2011, Melendez filed a DFEH complaint alleging discrimination and retaliation in LAUSD's promotion decisions and unequal pay for equal work. In December 2011,

9

Melendez approached Holmquist, told him about the complaint and asked for an out-of-class study to determine if he was doing the work of an AGC I and was therefore entitled to additional pay. According to Melendez, Holmquist said something like, "I'm not in a position to provide you a promotion or more pay, because otherwise every lawyer in OGC, all they'll have to do is to file a DFEH or discrimination complaint feeling that that's the way they're going to get promoted." Melendez replied he was not looking for a promotion as he was already doing the work. Holmquist replied he would let DFEH look into the matter.

D.     **Current Lawsuit**

In 2012, Melendez entered into a tolling agreement with LAUSD and filed this lawsuit in September 2016. In his first amended complaint, Melendez alleged seven causes of action, which expanded to eight when he filed his second amended complaint during the pendency of LAUSD's motion for summary judgment.

His first cause of action alleged discrimination based on race/national origin in violation of FEHA as set forth in Government Code section 12940 et seq. He alleged his race/national origin was a factor in LAUSD's failure to promote him and failure to provide equal pay for the duties he performed at OGC. Melendez identified three failures to promote within OGC: failure to promote to the positions of AGC I in May 2009, and AGC I and AGC II in August 2011. Melendez identified a fourth failure to promote him to Personnel Director of LAUSD in June 2011. Melendez also alleged he had been performing the duties and responsibilities of an AGC I since 2007, but was denied the title and pay for that position.

10

The second cause of action was for age discrimination in violation of FEHA. Melendez alleged the same set of failures to promote him.

The third cause of action was for disparate pay based on Melendez's race/national origin in violation of FEHA. Melendez alleged he had been performing the work of an AGC I but was being paid less than non-Hispanics performing the same work. He also alleged LAUSD had a policy of prohibiting certificated employees (but not classified ones) from requesting out-of-class work studies, disparately impacting Hispanic and minority employees.

The fourth cause of action alleged retaliation in violation of FEHA, based on Melendez's protected activity of "complaining of discrimination and engaging in other protected activities." In his common factual allegations, Melendez identified as "protected activity" a DFEH complaint he filed in 2003 claiming disparate pay and an informal complaint he made in 2008 to the General Counsel about the removal of a female Hispanic team leader. He also referred to the 2011 DFEH complaint he filed, which was the precursor to this lawsuit. The acts of retaliation were the ones "described earlier in [the] Complaint."

The fifth cause of action alleged failure to take reasonable steps to prevent harassment and discrimination in the workplace in violation of FEHA, specifically Government Code section 12940, subdivision (k).

The sixth cause of action sought declaratory and injunctive relief to end LAUSD's alleged violations of FEHA, "including but not limited to [LAUSD] denying [Melendez] equal pay for substantially similar or comparable work."

11

The seventh cause of action alleged unequal pay based on Melendez's Mexican origins in violation of Labor Code section 1197.5.

The eighth cause of action alleged retaliation in violation of Labor Code section 1197.5, subdivision (k). Melendez alleged the retaliation was prompted by his campaign for equal pay.

## THE PRE-TRIAL RULINGS

A trial court may grant summary judgment or summary adjudication upon a showing "that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) The moving party bears the initial burden of showing that the opposing party cannot establish "[o]ne or more of the elements of [its] cause of action" or by showing a valid affirmative defense. (*Id.*, subds. (o)(1), (p)(2).) If that burden is met, the "burden shifts" to the opposing party "to show that a triable issue of one or more material facts exists as to the cause of action or [an affirmative] defense." (*Id.*, subd. (p)(2).) " 'There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' " (*Burgueno v. Regents of University of California* (2015) 243 Cal.App.4th 1052, 1057, quoting *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.)

We review a trial court's grant of summary judgment or summary adjudication de novo to determine whether there are triable issues of material fact. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142.) Like the trial court, we strictly construe the moving papers and liberally construe the opposing papers. We view the moving papers in the light most

12

favorable to appellants.  All doubts about the propriety of granting the motion are resolved in favor of denial.  (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 717.)

"The rules of law that define the role of inferences in creating a triable issue of material fact are contained in subdivision (c) of Code of Civil Procedure section 437c.  When reviewing a motion, the court shall consider the evidence set forth in the papers and 'all inferences reasonably deducible from the evidence.'  [Citation.]  Generally, when conflicting inferences can be reasonably drawn from the evidence, a triable issue of fact is deemed to exist." (*Pierson v. Helmerich & Payne Internat. Drilling Co.* (2016) 4 Cal.App.5th 608, 627.)

Although we review the trial court's ruling de novo, it is appellant's burden to affirmatively demonstrate error.  (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)  "The appellant may not simply incorporate by reference arguments made in papers filed in the trial court, rather than briefing them on appeal." *(Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 656 (*Keyes*).)

A.     **All Claims Based on the 2009 Promotion Denial Are Time-Barred.**

The trial court granted summary adjudication in favor of LAUSD on all of Melendez's FEHA claims based on LAUSD's decision not to promote Melendez to the AGC I position in 2009.  The trial court found they were barred by the statute of limitations.  These causes of action require that a DFEH complaint be filed within one year of the discriminatory act.  (Gov. Code, § 12960, subd. (e).)  It is undisputed Melendez did not file a DFEH complaint until late in 2011, after the statute of limitations had run on the 2009 promotion decision.  The court rejected Melendez's argument that the continuing violation

13

exception to the limitations period applied; the court found the promotion decision had acquired permanence in May 2009 when Melendez did not attempt to have the decision overturned.

Melendez contends summary adjudication was not warranted on this limitations defense because a continuing violation may consist of either a series of related acts against an individual or " 'a company[-[wide policy or practice.' " (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 64 (*Morgan*).) Melendez contends a jury could have reasonably inferred a continuing policy or practice by LAUSD of not promoting Latino attorneys to supervisory or management positions. He further contends that when such a policy exists, individual violations which occur outside the limitations period remain viable.[2] Put differently, Melendez contends that the permanence bar does not apply in company-wide policy cases. We do not agree.

Melendez relies on a Ninth Circuit decision, *Williams v. Owens-Illinois, Inc.* (9th Cir. 1982) 665 F.2d 918 (*Williams*), as well as *Morgan,* for the proposition that a continuing violation may be established by demonstrating the existence of "a

---

[2] Melendez claims this exception applies to "all claims" arising out the 2009 failure to promote. However, he alleged only that LAUSD had a continuing policy of racial discrimination. Melendez has not cited any cases which hold that age discrimination or retaliation claims are to be treated as timely when an employer has a continuing policy of racial discrimination. Thus, even if the continuing violation exception could save his racial discrimination claims, it would not apply to his age discrimination and retaliation claims arising from the 2009 promotion decision.

14

company-wide policy or practice" and that individual violations which occur prior to the limitations period are actionable while the policy is ongoing. Both cases were decided before *Richards v. CH2M Hill, Inc.* (2001) 26 Cal.4th 798 (*Richards*), the California Supreme Court's seminal decision on the continuing violation doctrine. Nevertheless, Melendez contends *Richards* endorsed four different approaches to the continuing violation doctrine, including the "policy" approach discussed in *Morgan and Williams*. We read *Richards* differently.

The *Richards* court began its discussion of the continuing violation doctrine by stating: "A review of federal case law regarding the continuing violation doctrine reveals the doctrine to be, as one leading treatise has noted, 'arguably the most muddled area in all of employment discrimination law.' [Citation.]" (*Richards, supra*, 26 Cal.4th at pp. 812–813.) The *Richards* court identified four approaches to the continuing violation doctrine. The "first approach" described by the court is the one advanced by Melendez. Under this approach, "a continuing violation is found when a corporate policy is initiated before the limitations period but continues in effect within that period." (*Id.* at p. 813.) The *Richards* court acknowledged the Ninth Circuit's decision in *Williams* articulating this approach and also acknowledged, without mentioning *Morgan*, that some California Courts of Appeal had adopted this approach. (*Richards*, at p. 813.)

After surveying the four approaches taken by federal courts (and some California courts), the *Richards* court chose to "adopt a modified version" of the test set forth in *Berry v. Board of Supervisors of L.S.U.* (5th Cir. 1983) 715 F.2d 971 (*Berry*). (*Richards, supra*, 26 Cal.4th at p. 823.) The *Richards* Court

15

explained: "As in *Berry*, we hold that an employer's persistent failure to reasonably accommodate a disability, or to eliminate a hostile work environment targeting a disabled employee, is a continuing violation if the employer's unlawful actions are (1) sufficiently similar in kind—recognizing, as this case illustrates, that similar kinds of unlawful employer conduct, such as acts of harassment or failures to reasonably accommodate disability, may take a number of different forms [citation]; (2) have occurred with reasonable frequency; (3) and have not acquired a degree of permanence. (*Berry*, *supra*, 715 F.2d at p. 981.) But *consistent with our case law and with the statutory objectives of the FEHA*, we further hold that 'permanence' in the context of an ongoing process of accommodation of disability, or ongoing disability harassment, should properly be understood to mean the following: that an employer's statements and actions make clear to a reasonable employee that any further efforts at informal conciliation to obtain reasonable accommodation or end harassment will be futile." (*Richards*, at p. 823, italics added.)

This discussion does not simply adopt the *Berry* test for claims that an employer failed to accommodate an employee's disability or to eliminate a hostile work environment targeting a *disabled employee* only. Nor does it "reaffirm" the three other approaches to the continuing violation for other types of claims. We understand the *Richards* court as holding that the *modified Berry* test applies to all California FEHA claims.

In any event, whatever ambiguity might be found in the *Richards* opinion was subsequently clarified in *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028 (*Yanowitz*). The Court explained: "Nothing in *Richards* or *Romano* limited application of these principles to only harassment claims, rather than

16

discrimination or retaliation claims. (See *Birschtein v. New United Motor Manufacturing, Inc.* (2002) 92 Cal.App.4th 994, 1004 [112 Cal.Rptr.2d 347] [remarking that in *Richards,* the 'foundation of the court's rationale supporting application of the continuing violation doctrine in FEHA discrimination litigation is not so much accommodation itself as a process of conciliation' (italics omitted)].) Indeed, in *Richards,* we expressly applied the continuing violation doctrine to the plaintiff's disability discrimination claim, as well as to her disability harassment claim." (*Yanowitz*, at pp. 1057–1058.) "Thus, we reiterate that in a retaliation case, as in a disability accommodation or harassment case, the FEHA statute of limitations begins to run when an alleged adverse employment action acquires some degree of permanence or finality. (*Richards*, *supra*, 26 Cal.4th at p. 823.)" (*Yanowitz*, at p. 1059.)

Here LAUSD's 2009 failure to promote Melendez acquired finality in 2009, as the trial court so ruled. By the time the DFEH complaint was filed in 2011, the statute of limitations had run.

Even assuming for the sake of argument that the permanence rule does not apply when an employer had a company-wide or corporate policy of discrimination (as opposed to a series of related acts against an individual),[3] Melendez's 2009

_____

[3] We see no basis for such an exception. The facts of *Richards* involved a continuing violation which consisted of a series of related violations against one individual. However, the *Richards* court described the first approach to a continuing violation as involving corporate policy and did not reject the approach because the case before it did not involve a corporate policy.

17

claims would still be barred because he has not raised a triable issue of fact as to whether such a corporate policy existed within the limitations period for the 2009 claim. (See *Richards*, *supra*, 26 Cal.4th at p. 813 [noting that under *Williams* "a continuing violation is found when a corporate policy is initiated before the limitations period"].)

Melendez points out that he "alleged a policy of discriminatory animus against Latinos that prevented them from advancing into supervisory or management positions" and then points to statistics for 2017 to argue that "the lack of representation" continues. In order to defeat summary adjudication, Melendez had to raise a triable issue of fact concerning the existence of such a policy, not simply allege its existence. Statistics for 2017 cannot show whether a policy existed before the limitations period for his 2009 claim.

We recognize Melendez provided additional statistics earlier in the background section of his brief and later argued they show discriminatory intent as to LAUSD's individual decisions involving him. It is not this court's responsibility to analyze the statistics from Melendez's background section to determine whether they can support a reasonable inference that a discriminatory policy existed prior to 2010, or to do so using authorities cited in later argument sections of his brief involving a different use of the statistics. (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153 (*United Grand*) [we are not obliged to make arguments for appellant].) We briefly address some general points about Melendez's statistics. Any arguments not discussed below are deemed forfeited. (*Ibid*.)

18

"Although statistics have a place in a disparate treatment case, [citation], their utility 'depends on all of the surrounding facts and circumstances,' *International Bhd. of Teamsters,* 431 U.S. [324,] 340, 97 S.Ct. at 1857." (*Sengupta v. Morrison-Knudsen Co., Inc.* (9th Cir. 1986) 804 F.2d 1072, 1075 (*Sengupta*).)  Further, " ' "statistical evidence derived from an extremely small universe" . . . "has little predictive value and must be disregarded." ' " (*Ibid.* [sample of 28 is too small]; *see also International Bhd. of Teamsters,* at p. 340, fn. 20 [considerations such as small sample size may detract from the value of statistical evidence])  In small samples, "slight changes in the data can drastically alter appearances." (*Sengupta*, at p. 1076) The EEOC long ago concluded that statistics from small groups such as a pool of 30 applicants "are not dispositive." (*Ibid.*)

The statistics provided by Melendez involve very small numbers.  The number of management positions is tiny, ranging between 13 and 19 positions, including the General Counsel and Deputy General Counsel.  Further, while the statistics from 2003 and 2011 show no Latinos in management positions, the statistics are offered without context and do not account for other factors.  In particular, Melendez does not account for the fact that his baseline statistics from 2003 reflect a major reorganization and expansion which occurred within OGC in 2001, and all the new AGC I positions were filled with attorneys for the Facilities team to support LAUSD's massive school expansion project.  These additional attorneys could only have been outside hires.[4]

---

[4]     Melendez estimated there were six to eight attorneys before the expansion and 42 after it.  Thus 34 to 36 of the attorneys must have been outside hires.  Melendez has not shown that any

Melendez also fails to account for a 32 percent drop in the number of AGC I positions by 2011.  It is not reasonable to infer a discriminatory policy from a general lack of increase in Latinos in management positions when the number of such positions has drastically decreased.  For purposes of the continuing violation doctrine, Melendez was required to show a discriminatory policy beginning before 2010, and he has not done so.  His claims based on the 2009 failure to promote are time-barred.

B.     **Melendez Did Not Create a Triable Issue of Fact As to Whether LAUSD Denied Him Three Promotions in 2011 on the Basis of Race, National Origin or Age.**

The trial court granted summary adjudication on the claims in Melendez's first and second causes of action for age and racial discrimination which were based on the three promotion denials in 2011.[5]  The court found LAUSD offered legitimate non-discriminatory reasons for selecting someone other than Melendez for the positions, specifically that LAUSD found the other candidates better qualified than Melendez.

---

pre-expansion attorneys applied for any of the newly created AGC I Facilities positions or the newly created AGC II positions. The lack of Latinos in management positions in 2003 was thus attributable to decisions about new outside hires, not internal promotions.  Melendez's statistics are not sufficient to support an inference of a discriminatory policy in hiring Latino attorneys for management positions because the statistics are not accompanied by evidence of the composition of the applicant pool.

[5]     This ruling, together with the limitations ruling, completely disposed of the first and second causes of action.

Melendez contends summary adjudication was improper because the evidence showed that he was the "clearly superior" candidate for each of the three positions, and that fact alone raises a triable issue concerning whether LAUSD's explanation for hiring another candidate was pretextual. In the alternative, he contends that even if he was not "clearly superior," he was more qualified than the other candidate and that fact plus statistics and other evidence supporting an inference of pretext are enough to raise a triable issue of fact. The other evidence he identifies relates to LAUSD's failure to follow its own procedures in filling the AGC I position, contradictory explanations by LAUSD personnel over who selected Hunt for the AGC I position and direct expressions of animus by Holmquist, one of the decision-makers for the AGC I and AGC II positions.

1.  *Application of Summary Judgment Procedures to Claims of Discrimination*

California has adopted the three-stage burden-shifting test established by the United States Supreme Court for trying claims of discrimination based on a theory of disparate treatment, commonly referred to as the *McDonnell Douglas* test. (*Guz v. Bechtel National Inc.* (2000) 24 Cal.4th 317, 354 (*Guz*).) "At trial, the *McDonnell Douglas* test places on the plaintiff the initial burden to establish a prima facie case of discrimination. This step is designed to eliminate at the outset the most patently meritless claims, as where the plaintiff is not a member of the protected class or was clearly unqualified, or where the job he sought was withdrawn and never filled." (*Ibid*.) "Generally, the plaintiff must provide evidence that (1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he

21

suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive." (*Id*. at p. 355.) If, at trial, the plaintiff establishes a prima facie case, a presumption of discrimination arises. (*Ibid*.) "[A]t this trial stage, the burden shifts to the employer to rebut the presumption by producing admissible evidence, sufficient to 'raise[] a genuine issue of fact' and to 'justify a judgment for the [employer],' that its action was taken for a legitimate, nondiscriminatory reason. [Citations.] [¶] If the employer sustains this burden, the presumption of discrimination disappears. [Citations.] The plaintiff must then have the opportunity to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive." (*Id*. at pp. 355–356.)

"The Courts of Appeal have pondered how the *McDonnell Douglas* formula should apply, under California law, to an employer's motion for summary judgment against a claim of prohibited discrimination." (*Guz, supra*, 24 Cal.4th at p. 356.) We need not consider the "prima facie burden" issue when as here, the employer does not rely solely on the employee's failure to demonstrate a prima face case, but instead proceeds directly to the second step of the *McDonnell Douglas* formula. (*Id*. at pp. 356–357.) In such instances, when the employer sets forth competent, admissible evidence of its reasons for the adverse employment action, unrelated to the claimed age or race bias, the burden shifts to the employee to show there was nonetheless a triable issue that decisions leading to the adverse employment action were actually made on the prohibited bases of age or race. (*Id*. at p. 360.)

Here, LAUSD effectively proceeded to the second step of the *McDonnell Douglas* formula, offering evidence of legitimate nondiscriminatory reasons for its decision not to promote Melendez to the three positions at issue. In essence, LAUSD offered evidence that the selected candidate was better qualified than Melendez for the position. This shifted the burden to Melendez to show there was a triable issue that LAUSD's decisions were in fact made on the prohibited bases of age or race. Put differently, Melendez had to show that LAUSD's reasons for not promoting him were pretextual.

2.     *Melendez Did Not Offer Evidence That His Qualifications Were "Clearly Superior" To Those of the Promoted Applicants.*

Melendez contends the evidence showed that he was "clearly superior" to the other applicants for the three positions, and this is sufficient to raise a triable issue of fact on pretext.

When an employer's reason for not selecting a plaintiff for a position is that it selected the best qualified candidate, pretext may be inferred from evidence that the plaintiff had superior qualifications. (*Ash v. Tyson Foods, Inc.* (2006) 546 U.S. 454, 457.) Qualifications standing alone may establish pretext where the plaintiff's qualifications are " 'clearly superior' " to those of the selected job applicant. (*Raad v. Fairbanks North Star Borough School Dist.* (9th Cir. 2003) 323 F.3d 1185, 1194.)

a.     Qualifications for the 2011 AGC I Position (Hunt)

James Hunt was promoted to the 2011 AGC I position. Hunt ranked higher than Melendez on the eligibility list for the 2011 AGC I position. Melendez contends that the candidate

23

ranked highest on the list is not necessarily the most qualified overall. While other factors might outweigh the ranking, a candidate's ranking has relevance, if only to show that the person scored higher on the competitive exams and interviews for the position, and thus displayed a higher level of the knowledge or skills of the sort measured by the exam.

Melendez contends that notwithstanding Hunt's higher ranking, there is a triable issue of fact whether Melendez was more qualified because he had been at LAUSD for 27 years and Hunt had only been there 8 years. This position was not filled on the basis of seniority. The men's examination scores indicate that Hunt had comparable, if not slightly superior, technical knowledge and skills than Melendez, despite Melendez's longer service with LAUSD. Melendez's longer work experience thus does not raise a triable issue of fact as to whether his qualifications were clearly superior to Hunt's for this position. Melendez also points out that he had two certifications while Hunt had none. No certifications were sought or required for this particular position, and so Melendez's certifications do not raise a triable issue of fact as to whether Melendez's qualifications were clearly superior to Hunt's for this particular position. Finally, Melendez contends he had oversight of LAUSD's entire tort liability program, while Hunt was only the point person for a group of cases seeking to recover overpayments to some teachers. Melendez fails to note that the overpayment cases involved a high volume of cases with a large aggregate value of about $60 million. In terms of the two men's responsibilities, Melendez is comparing apples to oranges. Melendez supervised outside counsel, not LAUSD attorneys. Hunt testified at his deposition that he managed the recovery efforts, which involved about six

24

other OGC lawyers (and several employees from the payroll department). Hunt characterized part of his work as "helping the other lawyers who weren't litigators litigate the case." In addition, Hunt personally handled about 100 to 200 of the defendants (the same number as the other OGC lawyers). Melendez has not shown that his work experience was a better match for this particular position than was Hunt's, let alone raised a triable issue of fact as to whether his qualifications were "clearly superior" to Hunt's.

b. Qualifications for the AGC II Position (Molina)

Alexander Molina was selected for the AGC II position. Melendez's argument on appeal about his qualifications for this position is less direct than for the other two positions. Melendez contends his qualifications were clearly superior to those of Molina for this position, but Melendez relies on a comparison of their qualifications in 2009, when both men applied for an AGC I position. Regardless of the two men's qualifications in 2009, by 2011, Molina had been working as an AGC I for two years while Melendez had not.[6] More importantly, as Melendez acknowledges, Molina been working as the interim AGC II for this position and so had more recent relevant experience. Melendez's evidence does not raise a triable issue of fact as to whether his qualifications were clearly superior to Molina's qualifications.

---

[6] Melendez contends that he was doing the work of an AGC I even though he did not have that formal title. As we discuss below in connection with his disparate pay claim, he has raised a triable issue of fact on this issue.

25

Melendez contends, however, that he was not selected for the interim AGC II position because Holmquist was retaliating for Melendez's 2003 DFEH complaint. Melendez points only to evidence that Holmquist was aware of the complaint through news media accounts which Holmquist read in or about 2003. Even if this were sufficient to show retaliation, it does not negate the experience Molina acquired in the interim position. Further, it would not raise a triable issue of fact as to whether LAUSD discriminated against Melendez on the basis of race or age and so would not defeat summary adjudication on these claims.

      c.      <u>Qualifications for the Personnel Director Position (Glymph)</u>

Melendez contends there is a triable issue of fact as to whether his qualifications were clearly superior to Glymph's because Melendez had significant supervisory and management experience at the EEOC and extensive knowledge of the classified personnel system acquired from handling personnel matters, including Personnel Commission hearings, employment writs and appeals, and policy drafting for the Personnel Commission. He contends Glymph lacked such experience and knowledge.

Melendez's work with the EEOC ended more than 25 years before he applied for the Personnel Director position, and he had not performed comparable management or supervisory roles since beginning work for LAUSD in 1984. Glymph had supervisory experience within LAUSD at its internal television station. Their experiences are different and so not directly comparable.

Melendez had appeared before the Personnel Commission, and had done some policy work for the Commission. Glymph had experience working for both the Personnel Commission and the Division of Certified Human Resources. These experiences are not directly comparable, as Melendez encountered the Personnel Commission as a lawyer handling legal matters. Glymph's work was more administrative and analytical. Each acquired knowledge of LAUSD's personnel system, but through different means.

Both Glymph and Melendez passed a training and experience evaluation and were assessed on their performance on a simulated Board presentation. Both advanced to a management interview by a panel of LAUSD employees. There is nothing in the record to suggest that any of these individuals were aware of Melendez's 2003 DFEH complaint. At the conclusion of the interviews, LAUSD generated an eligibility list which shows Glymph, Kathleen Collins and Melendez as the top three ranked candidates, with Glymph ranked first. Thus, Melendez has not raised a triable issue of fact as to whether his qualifications as a whole were clearly superior to Glymph's qualifications for the position going into the final interviews where the selection occurred.

As Melendez acknowledges, the personnel commissioners were impressed with Glymph's "great people skills" and "personality." Although Melendez argues such subjective criteria should be "closely scrutinized," Melendez fails to offer any evidence or argument that Glymph did not have great people skills and personality. Melendez contends he had a good rapport with his teammates and received "exceeded expectations" on his job performance reviews involving interactions with clients and

coworkers.  This, he says, created a triable issue of fact over whether he or Glymph had superior interpersonal skills.  Even taking Melendez's own description of his interpersonal skills at face value, those skills are at best comparable to Glymph's skills. Melendez has not raised a triable issue of fact concerning whether his interpersonal skills were clearly superior to Glymph's skills.

  3.  *Melendez Did Not Offer Other Evidence Which Would Reasonably Support an Inference of Pretext.*

Melendez contends that even if he were not clearly superior to the other candidates, he was qualified for the positions and there was other evidence to support pretext.  LAUSD does not dispute that Melendez was qualified for the positions, but Melendez's evidence does not support a reasonable inference of pretext.

  a.  <u>Melendez's Statistics Do Not Support a Reasonable Inference of Pretext or Discriminatory Animus.</u>

Melendez points to statistics showing the number of Latino attorneys within OGC in 2011 and 2017.[7]  He contends there was a low number of Latino attorneys in management positions, which shows a pattern and practice of discrimination.  Such a pattern may, in turn, " 'create an inference of discriminatory

---

[7]  Melendez contends that he has provided evidence showing that the percentage of entry level Latino attorneys has been 17 percent to 20 percent since 2007.  However, his supporting record citations show data from 2011 and 2017.  Accordingly, we treat his reference to 2007 as a typographical error.

intent with respect to the individual employment decision at issue.' " (*Obrey v. Johnson* (9th Cir. 2005) 400 F.3d 691, 694.)

We note these numbers are for OGC and have no relevance to the Personnel Director position, which was not a part of OGC. Further, Melendez provides no discussion of age-related statistics at all.

Melendez's statistics show 13 management positions in 2011 and 19 such positions in 2017. Statistics derived from a small population have little to no probative value. (*Sengupta*, *supra*, 804 F.2d at p. 1076.)

In analyzing the statistics, Melendez contends the number of Latinos in entry-level Assistant General Counsel positions was the "pool" of applicants for the management jobs, that Latino attorneys have comprised 17 percent to 20 percent of the total number of Assistant General Counsels since 2011 and that even " 'accounting for possible nondiscriminatory variables,' one would expect to see an increasing number of Latino managers over time." Melendez has not in fact accounted for possible nondiscriminatory variables. (See *Sengupta*, *supra*, 804 F.2d at p. 1075 [utility of statistics depends on " 'surrounding facts and circumstances' "].)

Melendez has not shown that all entry-level Assistant General Counsels were the "pool" of applicants for all management positions. Melendez has not shown that all entry-level Assistant General Counsels could reasonably expect to successfully apply to the upper level management positions of AGC II, Deputy General Counsel or General Counsel which comprised six of the 13 total management positions in 2011 and six of the 19 total management positions in 2017.

Further, OGC was divided into teams with specialty areas. Melendez has not shown that an Assistant General Counsel on one team would be a qualified applicant for a management position on a different team, let alone the most qualified applicant. He has not shown which teams the Latino Assistant General Counsels were on, how many management positions were on each team, which teams had openings for managers during this period, or what if any management positions the Latino attorneys applied for.

Melendez contends an increasing number of Latino attorneys in management positions could be expected "over time," but provides no evidence to show what that time frame would be. Melendez has provided no evidence of the average or typical time an attorney works as an Assistant General Counsel before acquiring the knowledge and skills necessary for an AGC I position or how long an attorney works as an AGC I before gaining the necessary knowledge and skills to be qualified for an AGC II position. Without this information, it is not reasonable to infer that a proportionally smaller number of Latino attorneys in all management positions than in entry level positions which remained static for six years suggests discrimination in promotion.

Melendez has also failed to provide any information about the specific openings in management positions during the 2011 to 2017 period apart from the two positions for which he applied. We can infer there were at least six openings, since the number of AGC I's increased from seven in 2011 to 13 in 2017. The number of Latino attorneys in an AGC I position increased from zero to one in this time period. Thus, of the six known openings, one was filled by a Latino attorney. Put differently, about 17 percent of

30

the known AGC I management openings filled during this time were filled with a Latino attorney, a number comparable to Latino representation in entry-level positions. This refutes rather than supports Melendez's claim that Latino attorneys were not moving into management positions in increasing numbers.

        b.      <u>Melendez Has Not Offered Evidence that LAUSD Failed to Follow Its Own Policies or Gave Inconsistent Reasons for Its Decisions.</u>

Melendez contends that (1) LAUSD did not follow its own policies and procedures and (2) LAUSD decision-makers gave contradictory explanations for their choices, and that these facts raise an inference of pretext.

An employer's "failure to follow its own policies or procedures may . . . provide evidence of pretext." (*Moore v. Regents of University of California* (2016) 248 Cal.App.4th 216, 239.) "A triable issue as to an employer's veracity 'may arise where the employer has given shifting, contradictory, implausible, uniformed, or factually baseless justifications for its actions.' " (*Reeves v. MV Transportation, Inc.* (2010) 186 Cal.App.4th 666, 677.)

        i.  There Were No Deviations.

Melendez contends LAUSD deviated from its own standard practices in selecting Hunt for the 2011 AGC I position "by reusing an old eligibility list and not conducting interviews" before selecting a candidate, and further deviated by failing to show the eligibility list's expiration date had been extended.

31

Melendez relies on the deposition testimony of Eva Segee, the person designated by LAUSD as most knowledgeable about the use of ranked eligibility lists, to show that the use of "old" eligibility lists was a deviation from LAUSD practices. Segee's testimony as a whole, however, showed that ranked lists could be extended for a period beyond a year in a number of situations, including one where LAUSD would "end up with the same candidates again." An extension could also be approved depending on "the number of vacancies we could potentially have in the future." Thus, using an "old" eligibility list was not a deviation from standard practices.

LAUSD offered Holmquist's declaration that a current eligibility list based on the May 2009 was in place in or around August 2011. Holmquist authenticated a copy of the eligibility list which showed a three-year eligibility period for the candidates, ending in May 2012. Melendez nevertheless argues there is a triable issue of fact as to whether the list was extended because LAUSD has not identified the specific person who requested the extension. Melendez provides no reason in law or logic to impose such an additional and specific requirement on LAUSD. We see none.

Melendez also suggests LAUSD's failure to re-interview candidates for the position constituted a failure to follow procedures. He has not provided any evidence that it was LAUSD's policy to re-interview candidates who were on a valid eligibility list, or indeed that LAUSD had any specific interview policy or practice.

We note that in the background section of his briefing, Melendez states Holmquist moved the open AGC I position from the Labor and Employment Services Team to the Business and Government Services Team, and that Melendez had extensive

experience with labor and employment issues, while Hunt was on the Business team.  Melendez argues this demonstrates animus, but does not offer any evidence that there was anything unusual or improper about the move and does not cite any argument that a reorganization or realignment of positions can show pretext.  Accordingly, he has forfeited this argument.  (*United Grand*, *supra*, 36 Cal.App.5th at p. 153 [" 'appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record.' "].)  Holmquist explained that he moved the position to the Business team because it did not have an attorney in the AGC I position at the time.

ii.  There Were No Contradictory Explanations.

Melendez contends that Holmquist and McNair gave contradictory answers about who selected Hunt for the promotion, and that these contradictions support an inference of pretext.

Melendez testified at his deposition that McNair told him that McNair did not select Hunt for the AGC I position and that Holmquist selected Hunt.  McNair similarly testified at his own deposition that Holmquist selected Hunt but consulted with McNair about Hunt's selection to make sure that McNair had no objections.  Holmquist stated in his declaration that he "consulted with McNair to determine if he was agreeable to having Jim Hunt chosen as the first ranked candidate.  McNair agreed to have the interim position moved to his team, and agreed to select Jim Hunt as the first ranked candidate."  In context, Holmquist clearly made the initial decision to place Hunt in the position and McNair agreed to this decision.  McNair "was agreeable to having Jim Hunt chosen" and "agreed to select Jim Hunt," that is, McNair agreed to implement Holmquist's decision

33

to promote Hunt. Holmquist's agreement with defense counsel's deposition question that "when Mr. Hunt was hired, Mr. McNair selected Mr. Hunt; correct" is shorthand for this process, not a contradiction of it.

### iii. Holmquist Did Not Display Direct Animus.

Melendez contends Holmquist, who was the decision-maker for the AGC II position, directly expressed discriminatory animus toward Melendez's claims of discrimination. Melendez describes this expressed animus as Holmquist's December 2011 statement that "I'm am not in a position to provide you a promotion or more pay, because otherwise every lawyer in OGC, all they'll have to do is to file a DFEH or discrimination complaint feeling that that's the way they're going to get promoted." When Melendez responded that he was not asking for a promotion because he was already doing the work, Holmquist responded that he would let DFEH look into it. In context, Holmquist's statement is most reasonably understood as stating that he did not agree with Melendez's view of the situation and would let a third party (DFEH) resolve the differences. This is not improper animosity.

Further, even if Holmquist's statement did indicate some animosity towards Melendez's claim of discrimination in the promotion process, Melendez filed his DFEH claim after Molina was selected for the position. It is not reasonable to infer that Holmquist had animus against Melendez at the time of the selection, as Melendez had not yet filed a DFEH complaint.

### 4. *Conclusion*

Melendez has not shown that his qualifications were "clearly superior" to the qualifications of the individuals hired for the AGC I, AGC II and Personnel Director positions. Melendez

34

was certainly qualified for those positions, but that alone is not enough to raise a triable issue. Melendez has not provided statistics or any other evidence which would support an inference of pretext or discriminatory animus. He did not raise a triable issue of fact on his age and race discrimination claims.

C. **Melendez Has Not Shown That LAUSD Subjected Him or Any Other Latino Attorney to Disparate Pay on the Basis of Race.**

The trial court granted summary judgment on Melendez's third cause of action for disparate pay in violation of FEHA. The trial court found Melendez had not shown discriminatory animus because he had not shown that any individual at LAUSD had the authority to alter his pay, which was set by LAUSD's salary schedule and Melendez's specific salary step. LAUSD offered evidence that employees could request out-of-class studies, which might result in re-classification and thus higher pay, or back pay for temporary/interim out-of-class work. It was undisputed Melendez never formally made such a request, and thus any disparity in pay was attributable to Melendez's inaction. The trial court further found that Melendez had not offered sufficient statistical evidence to show that any LAUSD practice involving out-of-class studies had had a disparate impact on Latino attorneys.

Melendez contends the trial court erred in granting summary judgment because Melendez offered evidence that LAUSD treated non-Latino attorneys working out-of-class differently than it treated him. Melendez contends he was performing the work of Hunt, an AGC I, but receiving only the pay of an Assistant General Counsel. He contends Hunt and Molina were similarly situated to him, in that they performed

35

duties above their job classifications, and LAUSD paid them outside the salary schedule after LAUSD determined they were doing higher level work. He contends this disparate treatment of these similarly situated non-Latino attorneys was sufficient to permit a jury to infer a discriminatory motive as to Melendez's pay.[8]

Melendez did not offer evidence that he was performing the work of an AGC I in general, or that he was performing the same work as Hunt in particular. Melendez cited a document providing a general class description for an AGC I, but that document expressly states that it "is not a complete statement of essential function, responsibilities, or requirements." The list of duties is entitled "TYPICAL DUTIES." Attorneys in the position may be required to perform other duties as assigned. Melendez does not claim to perform all the duties included on that list, and it is unlikely any one attorney would be able to perform all the duties on that extensive list. Melendez has not shown the number or nature of duties any AGC I apart from Hunt is actually responsible for. And although Melendez claims that he

---

[8] In his opening brief, Melendez contended a jury could find discriminatory intent based on LAUSD's provision of false justifications for its failure to examine whether his pay was unequal. In response, LAUSD pointed out that Melendez's claim was for intentional pay discrimination, not a failure to examine such claims, which is not covered under DFEH (see Gov. Code, § 12940, subd. (a).) Melendez then clarified that his contention was that a jury could find intentional discrimination based on LAUSD's refusal to request an out-of-class study for Melendez even though Holmquist requested such studies for Hunt and Molina, who are not Latino. Accordingly, we do not consider Melendez's claim of false justifications for failure to examine.

36

performed the same duties as Hunt, this is not accurate. Hunt managed and assisted OGC attorneys who were litigating cases, while Melendez had no such supervisory duties.[9] Thus, a trier of fact would have no basis to conclude Melendez performed the duties of an AGC I.

Similarly, Melendez also failed to offer any evidence of the duties of the other Assistant General Counsels in OGC. Thus, there was no basis for a trier of fact to find that Melendez's duties were not typical of other Assistant General Counsels, and then to perhaps infer that he was performing duties outside of his classification.

Further, even if Melendez had been performing the duties of an AGC I, he did not offer evidence that he was treated differently than other similarly situated attorneys who were performing out-of-class duties. The salary studies which LAUSD undertook for Hunt and Molina at the request of OGC were for the time Hunt and Molina were formally in interim positions. LAUSD offered evidence OGC had a policy of asking the Personnel Commission for a "non-routine salary payment" for the period when an attorney was working in an interim position. That was the case with Hunt and Molina. Melendez was not in such a position. Thus, Melendez has not shown that he was similarly situated to Hunt and Molina but treated differently.

Melendez has not shown that LAUSD had a policy or practice of requiring supervisors to request out-of-class studies in

---

[9] Melendez complains that supervision of attorneys is not listed in the general class description of an AGC I. As we have just explained that description does not purport to be a complete statement of essential functions or responsibilities.

response to an employee's claim that he is working out of class. Thus, he has not shown that he was treated differently than other non-Latino attorneys. Similarly, Melendez has not shown that he requested such a study from the Personnel Commission or the Division of Certificated Human Resources, but was denied. It is undisputed Melendez was free to request such a study himself, but elected not to do so on his own behalf.

Melendez's annual job evaluation form asked if the employee or his supervisor believed the employee's assigned job duties were within the scope of his classification. It was not until the 2013–2014 evaluation that Melendez checked the box indicating he believed his assigned job duties were outside the scope of his classification. The evaluation form instructs an employee who believes he is working out-of-class to "attach a statement of the out-of-class duties to a copy of this form and send it to the Personnel Commission." (Italics omitted.) Melendez did not do so.

D.  **Melendez Did Not Offer Evidence Refuting the Lack of Causality Suggested by the Time Lapse Between the Protected Activity and the 2011 OGC Promotion Denials.**

The trial court granted summary adjudication on the retaliation claims involving the 2011 OGC promotions on the ground that there was no temporal link between Melendez's protected activity and LAUSD's actions. Melendez contends he provided evidence from which a jury could infer a temporal link.

"Past California cases hold that in order to establish a prima facie case of retaliation under the FEHA, a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment

38

action, and (3) a causal link existed between the protected activity and the employer's action." (*Yanowitz, supra*, 36 Cal.4th at p. 1042.) The causal link may be shown by " ' "the employer's knowledge that the [employee] engaged in protected activities and proximity in time between the protected action and allegedly retaliatory employment decision." ' " (*Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 615.)

A causal link based on proximity alone requires the employer's knowledge of the protected activity and the employer's action to be very close in time. Three months may be too long to support such a causal link and 20 months "by itself [suggests] no causality at all." (*Clark County School Dist. v. Breeden* (2001) 532 U.S. 268, 273–274 (*Clark County*); *Cornwell v. Electra Cent. Credit Union* (9th Cir. 2006) 439 F.3d 1018, 1035 [eight month gap "was too great to support an inference that Cornwell's complaints caused his termination"]; *Loggins v. Kaiser Permanente Internat.* (2007) 151 Cal.App.4th 1102, 1110, fn. 6 [noting the employee "cites no case holding that a nine-month hiatus between protected conduct qualifies as a 'relatively short time,' particularly when the protected conduct is first followed by 'non-adverse' actions [such as] a good performance rating"].)

Melendez implicitly acknowledges that the eight-year gap between his 2003 DFEH complaint and the 2011 promotion decisions would be too long to support an inference of retaliation if considered alone.[10] However, Melendez contends, correctly,

---

[10] Although we have found Melendez's claim based on the 2009 failure to promote time-barred, we note that this claim would also fail based on the six-year gap between it and the 2003 protected activity.

that even when there is a gap of more than a few years, a causal connection may be found if there is a pattern of conduct consistent with retaliatory intent between the protected activity and the adverse employment action. (*Wysinger v. Auto Club of Southern California* (2007) 157 Cal.App.4th 413, 421 (*Wysinger*).) Melendez has not offered evidence of a such pattern. He points only to conduct surrounding the 2011 promotion itself and to his request for a study on disparate pay that same year.

Melendez attempts to shorten the relevant time period by contending a jury could infer Holmquist was retaliating against him because former General Counsel Womack told Holmquist about Melendez's 2008 email/letter complaining about the lay-off of Verdugo and claiming Latinos were excluded from LAUSD management. We see no basis for such an inference. Melendez's reliance on *Wysinger* is inapt. In that case the employee filed an EEOC complaint which resulted in the employer cancelling pay reductions, and the Court of Appeal found it was reasonable to infer that a senior manager would know about the EEOC complaint because of its financial impact on the company. (*Wysinger*, *supra*, 157 Cal.App.4th at p. 421.) Melendez did not file a formal complaint in 2008, and has not shown any impact, financial or otherwise, on LAUSD from his email.[11] Further, the three-year gap between the 2008 email and the 2011 promotion denials is still too long to support an inference of retaliation. (*Clark County*, *supra*, 532 U.S. at pp. 273–274 [20-month gap suggests no causality at all].)

---

[11] If the claim were not time barred, we would reach the same conclusion about Fesler's knowledge; Fesler was the 2009 decision-maker.

40

In his reply brief, Melendez attempts to shorten the time period further by contending that the clock did not start to run until Holmquist was in a position to deny him a promotion, and that did not occur until Holmquist became General Counsel in 2009. We do not consider arguments made for this first time in a reply brief. (*Keyes*, *supra*, 189 Cal.App.4th at p. 656.) We note, however, that this argument still includes a two-year gap, which is sufficient to defeat causality. (*Clark County*, *supra*, 532 U.S. at pp. 273–274 [20-month gap suggests no causality at all].)

Melendez next contends there is a direct temporal link between his 2011 DFEH complaint and Holmquist "denying Mr. Melendez his requested investigation." Melendez filed his 2011 DFEH complaint in November 2011, and it included allegations of disparate pay. In December 2011, Holmquist told Melendez that he intended to let Melendez's claims be resolved through the DFEH complaint process rather than conduct an investigation himself. Melendez has not cited, and we are not aware of, any authority holding that allowing a complaint to be adjudicated equates to retaliation for filing the complaint. The two cases cited by Melendez involve situations where an inadequate investigation that resulted in the plaintiff's termination was treated as evidence the termination was pretextual. (*Mendoza v. Western Medical Center Santa Ana* (2014) 222 Cal.App.4th 1334, 1344–1345; *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 280.)

In Melendez's factual background section of his briefing, he also suggests that LAUSD retaliated against him by keeping the number of AGC I positions artificially low on his team (one AGC I for 11 staff attorneys) compared to other teams (two to five AGC I's for seven to eight attorneys) in order to reduce his chances of

41

promotion.  Melendez has not offered any evidence suggesting that the ratios should be the same on every team.  Each team had a different specialty and different area of responsibility.  Thus, Melendez has forfeited this claim.  (*United Grand, supra,* 36 Cal.App.5th at p. 153 [" 'appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record.' "].)

E.     **Summary Adjudication was Proper on the Dependent Failure to Prevent, Declaratory, and Injunctive Relief Claims.**

Melendez acknowledges that his causes of action for failure to prevent harassment and discrimination, declaratory relief and injunctive relief are based, in part, on his FEHA discrimination claims.  Because summary judgment or adjudication was properly granted on those claims, it was property granted on the linked failure to prevent, declaratory, and injunctive relief claims as well.

F.     **Judgment on the Pleadings on the Cause of Action Under Labor Code section 1197.5 for Unequal Pay Should Not Have Been Granted.**

While LAUSD's motion for summary judgment was pending, Melendez amended his complaint, which renumbered his seventh cause of action for unequal pay in violation of Labor Code section 1197.5 as the eighth cause of action and designated his seventh cause of action as one for retaliation in violation of Labor Code section 1197.5.  LAUSD failed to amend its separate statement of facts to track these changes, and the trial court denied LAUSD's motion for summary judgment due to these deficiencies.  On its own motion, however, the court elected to

42

treat LAUSD's motion for summary judgment as a motion for judgment on the pleadings, and then granted that motion. Melendez contends the trial court erred in granting judgment on the pleadings as to these two causes of action. We see no error in granting judgment on the pleading for the seventh cause of action for retaliation. We agree with Melendez that the eighth cause of action for unequal pay should have gone forward.

Generally, "[t]he summary judgment procedure '*presupposes* that the pleadings are adequate to put in issue a cause of action or defense thereto.' " (*Leek v. Cooper* (2011) 194 Cal.App.4th 399, 412.) However, a trial court may treat a summary judgment motion as one for judgment on the pleadings when the sufficiency of the pleadings is at issue. (*White v. County of Orange* (1985) 166 Cal.App.3d 566, 569.)

"The standard for granting a motion for judgment on the pleadings is essentially the same as that applicable to a general demurrer, that is, under the state of the pleadings, together with matters that may be judicially noticed, it appears that a party is entitled to judgment as a matter of law." (*Schabarum v. California Legislature* (1998) 60 Cal.App.4th 1205, 1216.) " 'Judgment on the pleadings does not depend upon a resolution of questions of witness credibility or evidentiary conflicts. In fact, judgment on the pleadings must be denied where there are material factual issues that require evidentiary resolution.' " (*Bezirdjian v. O'Reilly* (2010) 183 Cal.App.4th 316, 321–322.)

We review a trial court's ruling on a motion for judgment on the pleadings independently, accepting as true the plaintiff's factual allegations and giving them a liberal construction. (*Towery v. State of California* (2017) 14 Cal.App.5th 226, 231.) " 'While it is the duty of a reviewing court, in most cases, to

43

indulge in every reasonable presumption in favor of sustaining the trial court, substantially the reverse is true when [the] plaintiff appeals from a judgment on the pleadings.' " (*Lumbermens Mut. Cas. Co. v. Vaughn* (1988) 199 Cal.App.3d 171, 178–179.)

Labor Code section 1197.5 prohibits retaliation for actions an employee takes *pursuant* to that section. (Lab. Code, § 1197.5, subd. (k)(1) ["An employer shall not discharge, or in any manner discriminate or retaliate against, any employee by reason of any action taken by the employee to invoke or assist in any manner the enforcement of this section."].) Prior to January 1, 2017 section 1197.5 did not prohibit unequal pay based on race, and so Melendez could not have taken any action pursuant to section 1197.5 until January 1, 2017 or later. (Stats. 2016, ch. 856, §§ 2.5, 3 [Assem. Bill No. 1676; Stats. ch. 866, §§ 1.5, 3 [Sen. Bill No. 1063].) The only action Melendez took after that time was to file his amended complaint in November 30, 2017. In his amended complaint, Melendez did not identify any actions in 2017 and has not since identified any actions taken between November 30, 2017 and February 2018 when the trial court granted judgment on the pleadings. Accordingly, the trial court's ruling was correct.

However, the trial court did err in granting judgment on the pleadings without leave to amend for Melendez's unequal pay claim. When Melendez filed his amended complaint on November 30, 2017, he alleged ongoing unequal pay since 2007 due to race. Thus, Melendez did allege unequal pay after January 1, 2017. We treat this factual allegation as true for purposes of judgment on the pleadings. If the trial court believed the question of unequal pay raised a question of fact, the court

44

should not have granted judgment on the pleadings. If the trial court found the allegations unclear, the court should have granted Melendez leave to amend his complaint to clarify that he was seeking damages under Labor Code section 1197.5, subdivision (b), for the period beginning January 1, 2017. (See *Los Angeles Unified School District v. Torres Construction Corp.* (2020) 57 Cal.App.5th 480, 493–494 [" 'The practical effect of [treating a summary judgment motion as a motion for judgment on the pleadings] is that in granting judgment on the pleadings, the trial court may give the plaintiff the opportunity to amend the complaint even when no motion to amend has been filed.' "].)

LAUSD contends that judgment on the pleadings was nonetheless proper for the unequal pay claim because subdivision (b) of Labor Code section 1197.5 does not apply when the unequal pay is due to a merit system. (Lab. Code, § 1197.5, subd. (b)(1)(B).) While LAUSD does have a merit system for many, perhaps most, of its attorney positions, LAUSD has two types of employees, certificated and classified. The record on appeal shows that the merit system applies to classified attorneys. Melendez was a certificated employee and whether any difference in his pay was due to the merit system is a question of fact. (*Bezirdjian v. O'Reilly*, *supra*, 183 Cal.App.4th at pp. 321–322 [judgment on the pleadings must be denied when there are factual issues requiring evidentiary resolution].)

## THE TRIAL FOR FAILURE TO PROMOTE MELENDEZ TO PESONNEL DIRECTOR

Although the parties had earlier treated retaliation as the single reason prompting LAUSD to deny Melendez promotion to Personnel Director, by the time of trial both parties had proposed jury instructions appropriate for a mixed motive case. The

parties agreed that Melendez could establish his retaliation claim by proving that his protected conduct "was a substantial motivating reason" for LAUSD's adverse employment action.

Although LAUSD had not pled the affirmative defense of "same decision" (i.e., that it would have made the same decision absent retaliation, LAUSD offered an instruction raising that defense.[12]  As ultimately given, the instruction told the jury that if it found that retaliation was a substantial motivating factor for denial of the promotion, the jury should consider "LAUSD's stated reason for not giving him the Personnel Director position. [¶]  If you find that LAUSD's stated reason was also a substantial motivating reason, then you must determine whether LAUSD has proven that it would not have promoted Mr. Melendez to Personnel Director in 2011 anyway at that time based on the fact that he was not the most qualified applicant, even if it had not also been substantially motivated by retaliation."

LAUSD asked the trial court to instruct the jury with CACI 2512, the standard jury instruction for mixed motive/same decision cases.  That instruction tells the jury a plaintiff "will not be entitled to reinstatement, back pay or damages" if the jury finds the employer would have same the same decision absent the improper motive; this instruction would have precluded both economic and non-economic damages.  Melendez requested a

---

[12]     "Because the burden is on a defendant to make a same-decision showing, it should plead this defense.  In other words, if an employer wishes to assert the defense, it should plead that if it is found that its actions were motivated by both discriminatory and nondiscriminatory reasons, the nondiscriminatory reasons alone would have induced it to make the same decision."  (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 240 (*Harris*).)

46

modified version of the jury instruction which permitted the jury to award non-economic emotional distress damages even if it found LAUSD would have made the same decision absent the improper motive. The trial court instructed the jury with the modified instruction proposed by Melendez.[13]

During trial, the jury heard Melendez's testimony that his lost wages amounted to $289,991.89, which he calculated by subtracting his pay during the six years since the promotion decision from the pay for the Personnel Director position during that time. LAUSD did not dispute this calculation. The jury returned a verdict in favor of Melendez, and awarded damages in the amount of $210,833.00. The jury used the general verdict form provided by the court, which offered the jury only two options: finding in favor of Melendez or finding in favor of LAUSD. The form contained a single line for damages.[14]

---

[13] The instruction given to the jury read in pertinent part: "If you find that retaliation was a substantial motivating factor for LAUSD's decision not to promote Mr. Melendez to Personnel Director in 2011, [but] you [also] find that LAUSD would not have promoted Mr. Melendez to Personnel Director anyway at that time because he was not the most qualified applicant, then Mr. Melendez will not be entitled to any economic damages for any lost wage differential (past, present, or future), although you may still award emotional distress damages if you find that Mr. Melendez suffered emotional distress as a direct result of LAUSD's retaliatory acts, as opposed to any emotional distress he may have suffered as a direct result of not obtaining this promotion."

[14] LAUSD requested a special verdict form which would have had separate lines for past and future economic loss and non-economic loss including emotional distress. The trial court

47

LAUSD moved for a new trial, and for judgment notwithstanding the verdict.  The trial court denied both motions, and this appeal followed.

A. **The Trial Court Erred Prejudicially in Instructing the Jury that Emotional Distress Damages Were Available in a Same Decision Case.**

Although LAUSD objected to the modified instruction permitting emotional distress damages on the ground that it was contrary to the holding of *Harris,* the trial court decided to give the modified instruction stating:  "Did [*Harris*] ever specifically say you don't get noneconomic damages?  He had testimony about that.  It's very different because this is a different situation.  Unique.  I really, not getting emotional distress because I didn't get the job, I have the emotional distress because the manner in which I got denied the job was very upsetting to me and offended me.  [¶]  Look at his history and background, it's all about civil rights and things of that nature.  That's understandable to me."  When LAUSD pointed out that the court in *Harris* did say that the plaintiff could not get emotional distress damages, the court replied that it did not know what was in evidence about the *Harris* plaintiff's noneconomic damages and how they related to discrimination or to not getting the position.

LAUSD contends the trial court erred prejudicially in instructing the jury that it could award emotional distress

---

instead ultimately elected to give a general verdict form.  LAUSD contends the trial court abused its discretion in using the general verdict form.  It would have been preferable for the trial court to give a special verdict since there is a dispute over the type of damages which are permissible.

damages if it found LAUSD would have made the same decision due to Glymph's better qualifications. We agree.

1. *The Reasoning of Harris Does Not Permit Emotional Distress Damages in Same Decision Cases.*

Nothing in *Harris* suggests that the Court's ruling precluding emotional distress damages in "same decision" FEHA cases was conditioned on the plaintiff's ability to separate the various sources of her emotional distress or conditioned on the plaintiff having or lacking a background which made "understandable" her claim of emotional distress from the discriminatory motive rather than the termination itself. The Court established a clear rule that emotional distress damages are not available in same decision cases.

The *Harris* Court summarily rejected the idea that a plaintiff would be entitled to reinstatement, backpay or lost future pay in a same decision case. (*Harris*, *supra*, 56 Cal.4th at pp. 232–233.) The Court found such damages would give a plaintiff "an unjustified windfall and unduly limit[] the freedom of employers to make legitimate employment decisions." (*Id*. at p. 233.)

Turning to noneconomic damages, the court stated: "We come to the same conclusion with respect to noneconomic damages, although the issue is closer. There is no question that an employment decision motivated in substantial part by discrimination inflicts dignitary harm on the affected individual, even if the employer would have made the same decision in the absence of discrimination." (*Harris*, *supra*, 56 Cal.4th at p. 233.) The Court explained: "Although we do not doubt the stigmatic harm that discrimination can cause, we are reluctant to find such harm compensable in damages under the FEHA when other,

49

nondiscriminatory factors would have brought about the plaintiff's discharge.  Theoretically, it may be possible to distinguish, for example, between a plaintiff's emotional distress resulting specifically from discrimination and the plaintiff's emotional distress resulting from the termination itself.  Practically, however, as Harris's counsel conceded at oral argument, it is unrealistic to ask the trier of fact to parse the plaintiff's past mental state so finely and to award *only* the quantum of damages that corresponds to the emotional distress resulting specifically from discrimination rather than the termination itself if the employer makes a same-decision showing.  When an employee is fired, and when discrimination has been shown to be a substantial factor but not a 'but for' cause, we believe it is a fair supposition that the primary reason for the discharged employee's emotional distress is the discharge itself." (*Ibid*.)  The court clearly stated:  "Such distress is not compensable under the FEHA—indeed, compensation for such distress would be a windfall to the employee—if the employer proves it would have fired the employee anyway for lawful reasons." (*Id*. at pp. 233–234.)

The *Harris* court pointed out that a plaintiff in a same decision case could still recover damages for emotional distress if she proved intentional infliction of emotional distress or harassment under FEHA.  "But given the *inherent* difficulties in disentangling the possible sources of a plaintiff's emotional distress upon being fired, we conclude that a termination decision substantially motivated by discrimination is not compensable in damages under [Government Code] section 12940[, subdivision] (a) when an employer makes a same-decision showing." (*Harris*, *supra*, 56 Cal.4th at p. 234, italics added.)  The court also pointed

50

out that declaratory and injunctive relief were available to a successful plaintiff in a same decision case, and that attorney fees were also possible. (*Ibid*.)

The *Harris* court clearly referred to "the *inherent* difficulties in disentangling the possible sources of a plaintiff's emotional distress upon being fired." (*Harris, supra*, 56 Cal.4th at p. 234, italics added.) "Inherent" means "existing in someone or something as a permanent and inseparable element, quality, or attribute." (<https://www.dictionary.com/browse/inherent> [as of Aug. 5, 2021], archived at https://perma.cc/5HWE-NEN3.) Thus, the court's statement about the "inherent" difficulties of disentangling sources applies to all claims of emotional distress; it does not vary by plaintiff.

Melendez contends that even if the trial court's evidence-dependent reasons for modifying the instruction were incorrect, the instruction itself correctly states the law because *Harris* was only focused on termination cases. Although the facts of *Harris* involved a termination, there is nothing in the language or logic of the opinion to suggest the Court intended it to be limited to termination cases (or pregnancy discrimination cases, another specific fact of the case). The Court in *Harris* frequently discussed its reasoning with reference to the purpose of FEHA.

Further, Melendez has not made a cogent or compelling argument for limiting the emotional distress rule of *Harris* to termination decisions or creating an exception to the *Harris* rule for promotion denials. Melendez contends that the practical challenges of determining emotional distress mentioned in *Harris* are much less in promotion denial cases than in termination cases. Melendez believes that the bulk of emotional distress in termination cases comes from the termination itself, not the

51

discriminatory reason, while in promotion denial cases the bulk of the emotional distress comes from the discriminatory reason, not the promotion denial itself. We do not understand how flipping the damage proportions makes it easier to disentangle the sources of the damages.[15] Further, applying the no emotional distress damages rule only to terminations would result in a perverse outcome. A plaintiff who suffers the adverse employment action which has the most serious financial impact and which Melendez believes is the most traumatic (termination) would not be able to recover any damages, while a plaintiff who was subject to a less financially serious and, in Melendez's view, less traumatic adverse employment action (promotion denial) would be able to recover emotional distress damages.

2.    *LAUSD Was Prejudiced by the Erroneous Instruction.*

"When deciding whether an instructional error was prejudicial, 'we must examine the evidence, the arguments, and other factors to determine whether it is *reasonably probable* that instructions allowing application of an erroneous theory *actually* misled the jury.' [Citation.] A 'reasonable probability' in this context 'does not mean more likely than not, but merely a *reasonable chance,* more than an *abstract possibility.*'" (*Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659, 682.) "[W]e consider, insofar as relevant, '(1) the degree of conflict in the evidence on

_____

[15]    If it would be hard to disentangle the small amount of emotional distress attributable to discrimination in termination actions from the amount attributable to the termination itself, it should also be hard to disentangle the small amount of emotional distress attributable to the denial of promotion itself in a denial action from the larger amount attributable to the discrimination.

52

critical issues [citations]; (2) whether respondent's argument to the jury may have contributed to the instruction's misleading effect [citation]; (3) whether the jury requested a rereading of the erroneous instruction [citation] or of related evidence [citation]; (4) the closeness of the jury's verdict [citation]; and (5) the effect of other instructions in remedying the error [citations].' " (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 570–571 (*Soule*).)[16]

In reviewing the evidence, what the California Supreme Court said almost a hundred years ago "in *O'Meara v. Swortfiguer* (1923) 191 Cal. 12, 15 [214 P. 975] [remains] germane: 'It is true that in determining whether or not a verdict is supported by the evidence, we must assume that the jury accepted the view most favorable to the respondent. However, in determining whether or not the instructions given are correct, we must assume that the jury might have believed the evidence upon which the instruction favorable to the losing party was predicated, and that if the correct instruction had been given upon that subject the jury might have rendered a verdict in favor of the losing party.' (See also *Clement v. State Reclamation Board* (1950) 35 Cal.2d 628, 643–644 [220 P.2d 897]; *Oettinger* v. *Stewart* [(1944)] 24 Cal.2d 133, 140.)" (*Henderson v. Harnischfeger Corp.* (1974) 12 Cal.3d 663, 674.)

---

[16] The last three *Soule* factors are not relevant in the present case. No other instructions were capable of remedying the error in the modified version of CACI 2512. The jury did not request a re-reading of any jury instruction, including the erroneous instruction. The verdict was 9-3, and so was close, but there are several possible ways the vote could have split.

a.   The degree of conflict in the evidence on critical issues

The significance of the erroneous jury instruction was that it permitted the jury to find in favor of Melendez and against LAUSD, even if LAUSD would have hired Glymph anyway. Thus, there were two critical issues: (1) the strength of the evidence of a retaliatory intent on LAUSD's part compared to the strength of the evidence showing LAUSD would have hired Glymph in any event; and (2) the conflict in the evidence as to the amount of damages to be awarded.

i.   LAUSD's Same Decision Evidence Was Very Strong.

In a mixed motive case, the plaintiff must show "the employer's action was substantially motivated by [an improper reason] before the burden shifts to the employer to make a same-decision showing." (*Harris*, *supra*, 56 Cal.4th at p. 241.) The burden is on the defendant to show that a lawful reason was a substantial motivating factor in its decision and that the defendant would have made the same decision even if it had not been motivated by the improper reason. (*Id.* at p. 240.)

"[A] same-decision showing by an employer is not a complete defense to liability when the plaintiff has proven that discrimination on the basis of a protected characteristic was a substantial factor motivating the adverse employment action." (*Harris*, *supra*, 56 Cal.4th at p. 225.) Thus, even if a plaintiff does not respond to a defendant's stated legitimate reason with a showing of pretext or a showing that the defendant would not have made the same decision, the plaintiff will still be entitled to appropriate declaratory and injunctive relief, and may be eligible for reasonable attorney fees and costs. (*Id.* at p. 235.) If a

plaintiff does succeed in showing the defendant's stated lawful reason was pretextual or in disproving the defendant's claim that it would have made the same decision, the plaintiff may also recover damages.

Melendez offered sufficient evidence to support a finding that the personnel commissioners were aware of the contents of the due diligence report. The jury could have chosen to believe Melendez's testimony that Macy "told me that it had been given to the Personnel Commission members, [and] they had seen it." The jury could also have found that Macy was truthful and accurate in her statement to Melendez. Macy's statement was supported by other circumstantial evidence. Anna Forsberg, a senior human resources specialist who put together the recruitment process for the position, testified that she requested due diligence reports for the three finalists; such reports were routine. A representative of the OIG, which prepared the report, testified that the report was submitted to Macy, who was listed as the requesting person, and a copy was sent to Forsberg. Neither Forsberg nor Macy were decision makers for the Personnel Director position, and it is reasonable to infer that one or both of them would have provided the report to the people who were the decision makers. There would be no point in requesting the reports otherwise.[17]

Mere knowledge of protected activity is not sufficient to prove retaliation. In appropriate cases, retaliatory intent may be

[17] Forsberg testified that she just "glanced" at the report, placed it in her file cabinet and did not share or discuss it with anyone, even though the cover letter for the report stated that the OIG had found "a significant issue" and "encourages management to read the entire report."

55

shown by evidence that the employer's proffered reason was pretextual or dishonest. (*Guz, supra*, 24 Cal.4th at p. 356.) Pretext may be shown by " ' " " ' "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them "unworthy of credence," . . . and hence infer "that the employer did not act for the [asserted] non-discriminatory reasons." ' " ' " ' " (*Jumaane v. City of Los Angeles* (2015) 241 Cal.App.4th 1390, 1409.)

There was evidence from which a jury could infer that LAUSD did not act for at least some of its asserted reasons. Paller stated that even assuming Melendez was an "outstanding" lawyer, they did not need a lawyer for the position. The previous personnel director, however, was a lawyer from the OGC, and Paller characterized her work as amazing and awesome. Of the many candidates who applied, two of the top three ranked candidates (Melendez and Collins) were lawyers from the OGC, suggesting that being a lawyer was very good preparation/ background for the position. Similarly, according to Melendez, Ford told Melendez he and Glymph were tied for the position and the Commission selected Glymph because of her prior work as an analyst for the Personnel Commission. The two personnel commissioners denied making such a statement to Ford: Paller expressly and Vargas implicitly.[18] These implausible and inconsistent statements, if believed by the jury, could support an

---

[18]    Vargas was not asked about any statements to Ford, but implicitly denied Glymph and Melendez were tied for the job, testifying that Glymph stood out "head and shoulders above the others."

inference of pretext, particularly when considered with other inconsistent or implausible evidence related to the origins and dissemination of the due diligence report.

In contrast, there was strong direct evidence that Glymph's better qualifications were a substantial motivating factor in LAUSD's decision to hire her instead of Melendez and that LAUSD would have hired Glymph even if it had not been motivated by retaliation. Glymph was ranked higher than Melendez going into the final interviews. She had worked for the Personnel Commission for 10 years as a personnel analyst and had also worked in a number of other LAUSD positions, which gave her very broad experience. She worked as LAUSD's Administrative Services Manager, Executive Officer for the Board of Education, Director of Project Management and Construction, Deputy Business Manager and General Manager of LAUSD's television station. By comparison, Melendez had only worked in the OGC.

Paller and Vargas testified that Glymph's performance during the interviews was very impressive. Vargas testified that she "present[ed] with incredible poise, knowledge and confidence." She "stood apart from everybody else." Paller testified that Glymph was a "superstar" in the interviews and Melendez was not even close to her.

The trial court opined that Glymph was "one of the most impressive witnesses I've ever seen." Even plaintiff's counsel acknowledged that Glymph was impressive on the stand. While the trial took place seven years after Glymph was hired for the job and does not conclusively show Glymph's personality when she was hired, her personality in court is consistent with Paller's

57

and Vargas's description of her during her interview and corroborates that testimony.

There was also undisputed evidence that the Personnel Commission wanted to hire Glymph for the Personnel Director position in 2006, but that she was unable to commit to a five-year term. Paller directly testified that Glymph "was the one we really wanted to land from Day 1" and "it was always [Glymph] was going to be our first choice" if she applied. This is strong evidence LAUSD would have hired her even if it had not been substantially motivated by retaliation.

ii. The Amount of the Damages Award Indicates the Jury Awarded Only Emotional Distress Damages.

The second critical issue is the amount of economic damages for past lost wages to be awarded to Melendez. There was absolutely no conflict on this issue. The parties agreed on the precise number for those damages: $289,991.89. Although there was no formal stipulation, the jury was instructed that the parties agreed on the calculations. And although the jury was not bound by that number, there was no evidence to permit a rational inference that Melendez should get less than that number. Although Melendez did have treatment for cancer in 2016, he testified he missed only about two weeks of work. Melendez was still working for LAUSD at the time of trial, and testified he wanted to continue working for five more years.

b. Counsel's Arguments Indicate the Jury Awarded Only Emotional Distress Damages.

Melendez's arguments did not directly contribute to the effect of the erroneous instruction, but the arguments of both

58

parties shed light on whether the instructional error actually prejudiced LAUSD. Melendez argued that the agreed-upon figure was appropriate for lost back pay, and he sought five years of future lost pay (at an agreed-upon annual amount) in addition to damages for emotional distress. LAUSD directly told the jury during closing arguments that if Melendez prevailed, they should award the $289,000 figure calculated by Melendez as economic damages for the amount of past lost wages. LAUSD did not dispute the amount per year that should be awarded for future lost wages, although it did question the number of years Melendez might continue to work.

The amount awarded by the jury was less than the amount of the lost back wages alone. This is compelling evidence that the jury award represented non-economic damages. Such damages are compelling evidence that the jury found that while LAUSD was motivated by retaliation, LAUSD would have hired Glymph anyway. This conclusion is bolstered by the comparative strength of the underlying evidence on these issues.

Melendez argues that non-economic damages are typically awarded in round amounts, such as $210,000 rather than odd amounts such as $210,833. He cites to no evidence or authority to support this proposition.

Melendez contends the jury could have decided he would have retired in 2015 or 2016 after his cancer diagnosis if he had been earning the higher Personnel Director job salary. LAUSD did not make this argument or any argument suggesting back pay should be awarded in a reduced amount. Melendez testified he took two weeks off after his cancer surgery. He was still working for LAUSD at the time of trial, and testified that he intended to work for five more years. Thus, it is highly unlikely

that the jury awarded Melendez back pay but in a reduced amount.  Further, Melendez offers no explanation of how the jury would have arrived at the $210,833 figure for back pay.  If the jury used a formula to reduce $289,991.89 to reflect early retirement, it is not apparent from the amount actually awarded.[19]

### 3.    *Conclusion*

Weighing the factors together, there is a reasonable probability that the jury awarded only emotional distress damages, and that it did so because it believed LAUSD would have denied Melendez the promotion even in the absence of a retaliatory motive.  Thus, LAUSD was prejudiced by the erroneous instruction.  The emotional distress damages are unauthorized under *Harris* and are ordered stricken.

## B.    **The Trial Court Properly Denied LAUSD's Motion for Judgment Notwithstanding the Verdict.**

LAUSD contends the trial court erred in denying its motion for judgment notwithstanding the verdict (JNOV) because there was no substantial evidence to support the verdict.

We review a trial court's denial of a JNOV motion " ' "to determine whether there is any substantial evidence, contradicted or uncontradicted, supporting the jury's conclusion and where so found, to uphold the trial court's denial of the motion." ' " (*Shapiro v. Prudential Property & Casualty Co.*

---

[19]    We can perform calculations based on Melendez's post-trial retirement theory, but none result in the figure of $210,833.  For example, $289,991.89 minus $74,937 (the identified lost wages for 2017 and 2018) results in a figure of $215,054.89.

(1997) 52 Cal.App.4th 722, 730.)  We " ' "resolve any conflict in the evidence and draw all reasonable inferences therefrom in favor of the jury's verdict." ' " (*Hansen v. Sunnyside Products, Inc.* (1997) 55 Cal.App.4th 1497, 1510.)  We do not " ' "reweigh the evidence [citation], or judge the credibility of witnesses." ' " (*Ibid*.)

As we explain in our discussion of the evidence in the preceding section on the erroneous jury instruction, Melendez did present evidence from which a jury could find that the personnel commissioners had read the report.  His testimony about Macy's statement establishes that fact.  The report was created during the hiring process and of logical necessity provided to the commissioners during the selection process, which is sufficient temporal closeness to establish a causal link between the report and the decision.  (See *Fisher v. San Pedro Peninsula Hospital*, *supra*, 214 Cal.App.3d at p. 615.)

Melendez also presented evidence that the commissioners gave an implausible explanation that Melendez was not selected because the position did not need a lawyer and that the commissioners lied about their reason for preferring Glymph over Melendez.  "[E]vidence of dishonest reasons, considered together with the elements of the prima facie case, may permit a finding of prohibited [motive]." (*Guz, supra*, 24 Cal.4th at p. 356.)

LAUSD contends Melendez's evidence cannot support an inference of intentional retaliation because that requires a desire "to get back at somebody because they did something."  LAUSD seems to believe that the personnel commissioners could not possibly have intended to retaliate against Melendez because his protected activity was directed at LAUSD and not the Commission.  No level of personal animosity or desire for revenge

61

for wrongs to oneself is required for retaliation.  The decision maker might simply believe that a person who complained that his employer discriminated against minorities was not suitable for a leadership position.  Such a decision still punishes the applicant for engaging in protected activities and so is retaliation.  We conclude substantial evidence supports the jury's verdict on liability.

In discussing the trial court's ruling on the JNOV motion, LAUSD notes the Personnel Commission has statutory independence from LAUSD and this "raises the question of how LAUSD can be legally responsible for the Personnel Director selection decision that the Commission had exclusive authority to make."  An appellant must do more than raise questions to demonstrate error.  An " 'appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record.' " (*United Grand*, *supra*, 36 Cal.App.5th at p. 153.)  LAUSD has not provided such a cogent argument.

Finally, LAUSD acknowledges Melendez "could have" obtained declaratory or injunctive relief if appropriate, but contends he abandoned his separate cause of action for declaratory and injunctive relief by submitting a final judgment which made no mention of this relief.  LAUSD relies on *Davis v. Farmers Ins. Exchange* (2016) 245 Cal.App.4th 1302 (*Davis*) to support this claim.  We agree Melendez failed to preserve his claims for declaratory and injunctive relief.

Melendez addresses this issue only briefly, in a footnote in his combined opening and respondent's brief.  He argues only that he is not similarly situated to the plaintiff in *Davis* because he "preserved a claim for declaratory and injunctive relief in his operative Complaint."  Although *Davis* involves a pleading issue,

the court also pointed out that before trial the plaintiff did not "ask[] the court to resolve any equitable issues first, nor suggested he intended to seek a court trial on any equitable claim following the jury trial." (*Id*. at p. 1326.) As the *Davis* court summed it up: "In short, appellant did nothing to suggest he intended to seek injunctive relief." (*Ibid*.) Thus, the *Davis* plaintiff's failure to request declaratory or injunctive relief in the trial court played a role in the court's holding that the plaintiff did not preserve his claim.

Melendez points to a footnote in his Opposition to LAUSD's Motion for JNOV as an indication he preserved his claims for injunctive and declaratory relief. That footnote is virtually identical to the one in his brief on appeal. In both footnotes, Melendez offers no explanation for his failure to seek such relief before or in a final judgment. Accordingly, we find he has forfeited his right to seek declaratory and injunctive relief on remand.

## APPEAL OF ATTORNEY FEES AWARD

LAUSD filed a separate appeal challenging the trial court's order awarding attorney fees and costs to Melendez as the prevailing party. In light of our ruling striking the damages award only on the retaliation cause of action and remanding the Labor Code unequal wage causes of action for adjudication, we vacate the award of attorney fees and costs so that the trial court can determine, at the conclusion of the action, whether Melendez is still the prevailing party entitled to fees and costs. We express no view on how the trial court should decide this issue.

63

## DISPOSITION

The order granting summary adjudication is affirmed. The order granting judgment on the pleadings is affirmed as to the cause of action for retaliation in violation of Labor Code section 1197.5 and reversed as to the cause of action for unequal pay in violation of that section. The damage award on the retaliation claim is ordered stricken, but the judgment as to liability is affirmed. The matter is remanded to permit the trial court to decide whether attorney fees and costs are still warranted for Melendez, and to permit Melendez to pursue his Labor Code claim for unequal pay. The award of attorney fees and costs is vacated for redetermination by the trial court at the conclusion of the action. Parties to bear their own costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, J.

We concur:

GRIMES, Acting P. J.

WILEY, J.

64